[L.A. No. 31668. Oct. 20, 1983.]

CLEROW WILSON, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

[redacted]

## COUNSEL

Paul F. Moore II and Thomas P. Allen III for Petitioner.

Quin Denvir, State Public Defender, Charles M. Sevilla, Chief Deputy State Public Defender, Kenneth M. Wells, Public Defender (Sacramento), Everett J. Avila, Assistant Public Defender, James J. Brosnahan, Christine Hall, Karen Snell, Doron Weinberg, Timothy Brosnan, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz and Fred Okrand as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Robert H. Philibosian and John K. Van de Kamp, District Attorneys, Harry B. Sondheim, Donald J. Kaplan, Richard W. Gerry, Suzanne Person and Roderick W. Leonard, Deputy District Attorneys, for Real Party in Interest.

John K. Van de Kamp and George Deukmejian, Attorneys General, Daniel J. Kremer and Robert H. Philibosian, Chief Assistant Attorneys General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., Shunji Asari, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, and Christopher N. Heard as Amici Curiae on behalf of Real Party in Interest.

## OPINION

KAUS, J.—In this writ proceeding, Clerow (Flip) Wilson seeks review of a trial court ruling which denied his motion to suppress evidence obtained as a result of police activity at the Los Angeles International Airport. (Pen. Code, § 1538.5, subd. (i).) Wilson contends that the police conduct in question violated the search and seizure provisions of both the federal and state Constitutions and that the evidence should therefore be excluded from his

impending trial. In response, the People maintain (1) that the police action was proper under both federal and state standards and (2) that even if the conduct violated state search and seizure principles, the evidence may not be excluded on that basis in light of article I, section 28, subdivision (d) of the California Constitution, the so-called "Truth-in-Evidence" provision enacted as part of an initiative measure—Proposition 8—adopted at the June 1982 election.

As explained, we conclude that the evidence at issue was obtained in violation of the federal Constitution and must be suppressed on that basis. Accordingly, we need not reach the other issues raised by the parties.

I

At the hearing on the motion to suppress, the arresting officer, Detective Roi Kaiser, and Wilson each testified to the events leading up to the discovery of the challenged evidence. Although the two agreed on a number of general facts surrounding the discovery, their testimony conflicted sharply with respect to many important details. Since the trial court resolved this matter in favor of the prosecution, for purposes of this proceeding we view the record in the light most favorable to the People's position. In the interest of completeness, however, we note the main points of conflict shown by the record.

At the time of the events in question—March 10, 1981—Detective Kaiser, a Los Angeles police officer, had been working as an undercover narcotics agent at the Los Angeles International Airport for four and a half years, monitoring inbound flights from Florida in an attempt to discover persons transporting narcotics into California. Kaiser testified that about 11:30 a.m. on that day, he and his partner, Deputy Gary Frederick—who was also in plain clothes—went to the Pan American Airlines arrival area to monitor the arrival of a flight from Miami. As the passengers left the plane and entered the terminal, Kaiser saw Wilson with another man, later identified as Wilson's nephew, Rashon. Kaiser testified that he was not expecting to see Wilson arrive on that flight, but that he recognized him from his television appearances. Wilson was carrying an attache case and Rashon was carrying a box bearing the name "Flip Wilson." Kaiser testified that he noticed nothing unusual about these items.

As Kaiser watched, both Wilson and Rashon looked around the waiting area. Kaiser stated that at this time he observed nothing unusual about Wilson, but that Rashon made "eye contact" with him on two occasions, an occurrence which was consistent with the behavior of persons he had arrested in the past for transporting narcotics. Although acknowledging that

Rashon could have simply been looking for someone who was meeting the plane, Kaiser testified that it did not appear that way to him. He conceded, however, that he could not articulate any objective basis for differentiating the "eye contact" of drug couriers from that of other persons.

As Wilson and Rashon walked at a normal pace from the arrival area down a concourse to the street, Kaiser followed about 10 feet behind. Midway down the 200-foot concourse, Rashon turned his head back in Kaiser's general direction and immediately turned back to speak to Wilson, who then also turned his head back in the general direction of Kaiser. Neither man made eye contact with Kaiser at this time.

At the end of the concourse, Wilson and Rashon were met by Wilson's wife and all three walked outside to Wilson's car which was parked at the curb. Rashon handed the box he was carrying to Wilson, who put it and the attache case in the rear seat of the passenger compartment. Rashon then went to the baggage claim area to retrieve their luggage.

A few minutes later, as Rashon left the baggage claim area with two pieces of luggage, Kaiser and Frederick approached him. Frederick identified himself as a police officer and had a brief conversation with Rashon which Kaiser apparently did not overhear.

Kaiser then approached Wilson, who—according to Kaiser—was then standing at the open trunk of the car.[1] Kaiser testified that at that point he "had a slight suspicion" that Wilson "possibly" was involved in criminal activity, and that his purpose in speaking to Wilson was to request permission to search his luggage. Kaiser stated that as he reached Wilson, he displayed his police identification, told him that he was a police officer and asked if he "might have a minute of his time." When Wilson responded, "Sure," Kaiser testified that "I advised Mr. Wilson that I was conducting a narcotics investigation, *and that we had received information that he would be arriving today from Florida carrying a lot of drugs.*" (Italics added.)[2]

On cross-examination, Kaiser disclosed that he had obtained the information to which he referred from his partner, Frederick, who, in turn, had learned of it from another person. On defense counsel's motion, the court ruled that if the People intended to rely on such information to justify the

---

[1]Wilson testified that when Kaiser first approached him, he was seated in the driver's seat of the car and Kaiser leaned in through an open rear door.

[2]According to Wilson, Kaiser "stated that he had received a call from a young black man saying that I would be arriving, and that I would be carrying a large quantity of narcotics."

officer's actions, Frederick would be required to testify as to the nature and source of the information. (See, e.g., *People* v. *Madden* (1970) 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971]; *Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 666-667 [87 Cal.Rptr. 202, 470 P.2d 11]; *People* v. *Harvey* (1958) 156 Cal.App.2d 516, 523-524 [319 P.2d 689] (conc. opn. of Dooling, J., and Draper, J.).) When the People indicated that they did not intend to call Frederick as a witness, the court held that the prosecution could not rely on such information to support the validity of the police conduct. The People have not challenged that ruling in this proceeding.[3]

After having told Wilson that he had information that Wilson was carrying "a lot of drugs," Kaiser asked if he could search the two pieces of luggage that Rashon had just set on the curb and the box which had been placed inside the car. Wilson allegedly responded, "Sure, I don't have any drugs that I know of. Go ahead and search."[4] When Kaiser went to the rear passenger seat, he saw the attache case and asked Wilson for permission to search it. Kaiser testified that Wilson then said: "There should only be some papers in there, but you can go ahead and look, if you'd like."[5]

Wilson then placed the case on the rear seat and opened it. Kaiser searched through the case and retrieved a glass vial from a pocket on the inside of the lid of the case. At that point, Wilson allegedly stated: "That's just a little bit of hash oil in there."

After examining the bottle and concluding that it did contain hash oil, Kaiser asked Wilson "if he would mind accompanying me back to the nar-

---

[3]A question was raised at oral argument as to whether the trial court's ruling on the so-called *Harvey/Madden* issue was consistent with federal, as well as state, law. The parties have not provided any relevant authorities on the question, and inasmuch as the People did not raise any objection to the ruling either at the suppression hearing or in any of their papers filed in this proceeding, we have no occasion to address this academically intriguing question in this case. (Cf. *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048] (defendant may not raise *Harvey/Madden* issue on appeal where point not properly preserved).)

[4]Wilson testified that when he was first approached by Kaiser, the officer informed him that he had a search warrant for his luggage. Wilson stated that because he had an important engagement and was very pressed for time, he told his nephew to cooperate with the search of the luggage.

[5]Wilson testified that when Kaiser requested permission to search the attache case, the following colloquy occurred: "I said, 'I would prefer that you didn't.' [¶] And he said, 'Are you telling me that I cannot search the attache case?' [¶] I said, 'I would prefer that you didn't.' [¶] He said, 'Are you refusing to allow me to search the attache case?' [¶] And I said, 'Sir, I am telling you that I would prefer that you didn't.' [¶] And he said, 'I am not concerned if you're carrying just a small stash for your personal use. I'm only concerned with a large quantity.' [¶] And he said, 'I've been to Hollywood parties where they had cocaine on the tables by bowls, and I did not make arrests.' . . . So then I—. . . I said, 'Since you put it on those terms, okay.' [¶] So I turned around in the seat, and I leaned over the back of the driver's seat, and I opened the attache case and I raised the lid."

cotics office situated at the airport . . . ." Kaiser testified that at that point Wilson was actually under arrest, although Kaiser had not so informed him. Wilson asked if they could drive to the office in his car so he could remove it from the street, and Kaiser agreed. At the office, Kaiser continued his search of the luggage and found another small glass vial, containing a substance resembling cocaine, inside an eyeglass case in another pocket of the attache case. Wilson was then formally placed under arrest and taken into custody.

At the conclusion of the suppression hearing, defense counsel argued that Wilson's testimony indicated that he had not voluntarily consented to the search as Kaiser claimed, but that even if Kaiser's version of the events was accepted in full, the evidence should still be suppressed because Kaiser's testimony itself established that Wilson had been detained without adequate justification when the claimed consent was given. Defense counsel relied on both federal and state authorities to support his illegal detention claim, though he emphasized the more recent state precedents. In denying the motion, the trial court stated: "The court is of the view, that, one, this was not a detention; that the information—conduct of the officer was sufficient to justify the approach of a citizen on the street in asking to talk to him with the subsequent items that developed. [¶] Now, it may be that the court has the wrong view of the law in respect to that; but my reading of Tony C. [*In re Tony C.* (1978) 21 Cal.3d 888] and the cases that follow it are such that the court has made the ruling that it has."

In this proceeding, Wilson challenges the trial court ruling on two alternative grounds, maintaining that the court's conclusion is inconsistent with (1) the line of California decisions emanating from this court's opinion in *Tony C.,* and (2) recent decisions of the United States Supreme Court applying federal Fourth Amendment principles in similar airport-search settings. Since we conclude that Wilson's federal constitutional claim is dispositive, we address only that issue.

## II

### A.

Wilson concedes that the trial court could find on the basis of Kaiser's testimony that he consented to the search of his attache case, a search which disclosed the vial of hash oil and resulted in his arrest. ▪ He contends, however, that even if Kaiser's testimony is accepted at face value, the evidence presented at the hearing demonstrates, as a matter of law, that at the time he consented to the search he was under an illegal detention in violation of the Fourth Amendment. Accordingly, he maintains that the evidence

obtained as a result of that consent must be suppressed as a fruit of an illegal detention. In support of his claim, Wilson relies on two recent decisions of the United States Supreme Court involving similar airport searches and seizures, *Reid* v. *Georgia* (1980) 448 U.S. 438 [65 L.Ed.2d 890, 100 S.Ct. 2752] and the court's very recent decision in *Florida* v. *Royer* (1983) — U.S. — [75 L.Ed.2d 229, 103 S.Ct. 1319]. As we explain, we conclude that *Reid* and *Royer* do support Wilson's claim.

In analyzing the federal constitutional issue, Justice White's lead opinion in *Royer* provides a logical starting point.[6] In that opinion, Justice White reviewed the general Fourth Amendment framework that governs the kind of warrantless, investigatory activities that are frequently undertaken by law enforcement officers in an airport setting. (— U.S. at p. — [75 L.Ed.2d at pp. 233-239, 103 S.Ct. at pp. 1323-1326].) ■ For purposes of Fourth Amendment analysis, there are basically three different categories or levels of police "contacts" or "interactions" with individuals, ranging from the least to the most intrusive. First, there are what Justice White termed "consensual encounters" (*id.* — U.S. at p. — [75 L.Ed.2d at p. 243, 103 S.Ct. at p. 1329]), which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever—i.e., no "seizure," however minimal—and which may properly be initiated by police officers even if they lack any "objective justification." (*Id.* — U.S. at p. — [75 L.Ed.2d at p. 236, 103 S.Ct. at p. 1324].) Second, there are what are commonly termed "detentions," seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police "if there is an articulable suspicion that a person has committed or is about to commit a crime." (*Ibid.*) Third, and finally, there are those seizures of an individual which exceed the permissible limits of a detention, seizures which include formal arrests and restraints on an individual's liberty which are comparable to an arrest, and which are constitutionally permissible only if the police have probable cause to arrest the individual for a crime. (*Id.* — U.S. at p. — [75 L.Ed.2d at p. 237, 103 S.Ct. at p. 1325].)

In this case, Wilson makes no claim that at the time he consented to the search of his attache case he was subjected to restraints which exceeded the

---

[6]In *Royer,* four judges—Justices White, Marshall, Powell and Stevens—joined in Justice White's lead opinion, which reversed Royer's conviction on the ground that his consent to search his luggage had been obtained as the result of an illegal seizure which exceeded the bounds of a permissible detention. Justice Brennan filed a separate opinion, concurring in the result but disagreeing with some of the reasoning of the lead opinion. The four other judges dissented, with Justice Rehnquist writing a dissenting opinion joined by Chief Justice Burger and Justice O'Connor, and Justice Blackmun writing his own separate dissent.

Although the judges were widely split on the *application* of federal constitutional principles to the facts of *Royer,* a close reading of the various opinions suggests that the court is in general agreement as to the overall Fourth Amendment framework summarized in Justice White's lead opinion.

permissible bounds of a detention. ■ Thus, the principal question before us is simply whether the police conduct which preceded Wilson's consent involved only a "consensual encounter" which the police could undertake without objective justification, or whether it amounted to a "detention" which would be permissible only if the police had an objective, articulable basis for suspecting Wilson of criminal conduct. In this regard, Wilson contends that the record establishes, as a matter of law, that (1) the prosecution failed to prove the requisite "objective articulable suspicion" to justify a detention, and (2) he was, in fact, "detained." We turn first to the "articulable suspicion" issue.

## B.

As we have seen, at the suppression hearing Detective Kaiser described in considerable detail his observations of Wilson and Rashon which preceded his direct contact with Wilson. Of the facts related by Kaiser, the only two circumstances that might even plausibly be proffered as a basis of an "articulable suspicion" are (1) Rashon's "eye contact" with Kaiser upon first entering the arrival area of the terminal, and (2) the fact that both Rashon and Wilson looked back in Kaiser's general direction as they walked down the concourse toward the airport terminal exit. Wilson contends that these circumstances, singly or in combination, do not rise to the level of an "objective, articulable suspicion" so as to justify even a limited detention under Fourth Amendment principles.

The United States Supreme Court's decision in *Reid* v. *Georgia, supra,* while arising out of different facts, directly supports Wilson's claim. In *Reid,* an undercover narcotics agent at the Atlanta airport observed the defendant as he arrived on an early morning flight from Fort Lauderdale. As the passengers left the plane and walked down the airport concourse single file, the agent saw the defendant occasionally look back at a second passenger who was separated from him by several other passengers. When the passengers reached the main lobby of the terminal, the second man caught up with the defendant, the two talked briefly, and they then left the terminal together.

The agent approached the two men outside the building, identified himself as a narcotics agent and asked to see their airline stubs and identification. The men complied with the request. The tickets revealed that they had both been bought with defendant's credit card and that the two men had been in Fort Lauderdale for only one day. At this point, the men appeared nervous and the agent asked if they would agree to return to the terminal and consent to a search of their persons and their bags. The agent testified that the two agreed, but, as they returned inside the building, the defendant ran, dis-

carding his bag. He was quickly apprehended and the bag turned out to contain cocaine.

On these facts, the Georgia Court of Appeal, relying on the agent's testimony that the defendant appeared to fit the airport's "drug courier profile" in a number of respects, held that the officer had "reasonable suspicion" to approach and detain the two men outside the terminal building. Specifically, the Georgia court found it relevant that "(1) the [defendant] had arrived from Fort Lauderdale, which the agent testified is the principal place of origin of cocaine sold elsewhere in the country, (2) the [defendant] arrived in the early morning, when law enforcement activity is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags." (448 U.S. at p. 441 [65 L.Ed.2d at p. 894].)

In *Reid,* the United States Supreme Court reversed the Georgia decision, concluding "that the agent could not, as a matter of law, have reasonably suspected the [defendant] of criminal activity on the basis of these observed circumstances." (*Ibid.*) The court reasoned: "Of the evidence relied on, only the fact that the [defendant] preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure. Nor can we agree, on this record, that the manner in which the [defendant] and his companion walked through the airport reasonably could have led the agent to suspect them of wrongdoing. Although there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot [citation], this is not such a case. The agent's belief that the [defendant] and his companion were attempting to conceal the fact that they were traveling together, a belief that was more an 'inchoate and unparticularized suspicion or "hunch" ' [citation], than a fair inference in the light of his experience, is simply too slender a reed to support the seizure in this case." (*Ibid.*)

This reasoning applies equally to the present case. Indeed, the facts before us appear, if anything, even less suspicious than those in *Reid.* Aside from the brief "eye contact" with Rashon—a reed at least as "slender" as the agent's suspicion in *Reid*—the officer did not identify any circumstance which would provide a reasonable basis for distinguishing Wilson from the great bulk of passengers arriving at the Los Angeles International Airport. Thus, on this record, we conclude as a matter of law that the police did not have an objective, articulable basis to justify a detention of Wilson. Ac-

cordingly, the determinative issue is whether at the time of his consent Wilson was "detained" for Fourth Amendment purposes or whether he was simply engaged in a "consensual encounter."

## C.

*Reid* does not provide an answer to the detention issue. Although holding that the circumstances known to the officer before he approached the two suspects did not rise to the level of "articulable suspicion," the *Reid* court did not directly address the issue of whether the officer's conduct amounted to a "detention" of the suspects or, if it did, at what point the detention had begun: because the lower courts had concluded that there was reasonable suspicion to justify a detention, they had not found it necessary to decide whether or not the defendant had been detained; the Supreme Court— while reversing on the reasonable suspicion point—did not reach the detention question, leaving the initial resolution of that matter to the state courts on remand. (See *Reid, supra,* 448 U.S. at p. 443 [65 L.Ed.2d at p. 895] (conc. opn. of Powell, J.).)[7]

While *Reid* thus does not assist us in distinguishing "consensual encounters" from "detentions," the Supreme Court's recent decision in *Royer* does afford considerable guidance on this point. In *Royer,* two undercover narcotic agents working at the Miami airport testified that they first took note of Royer because they believed that his "appearance, mannerisms, luggage and actions fit the so-called 'drug courier profile.' " (— U.S. at p. — [75 L.Ed.2d at p. 233, 103 S.Ct. at p. 1322].) As they observed him, Royer purchased a one-way ticket to New York and checked his two suitcases, placing on each an identification tag with the name "Holt." As he walked along the concourse toward the airline boarding area, the two officers approached him, identified themselves as policemen working out of the sheriff's office, and asked him if he had a "moment" to speak with them. He said, "Yes."

At the officers' request, Royer produced his airline ticket and driver's license; the ticket—like the baggage identification tags—was made out in

---

[7]Similarly, in *United States* v. *Mendenhall* (1980) 446 U.S. 544 [64 L.Ed.2d 497, 100 S.Ct. 1870]—an airport search case decided just two weeks before *Reid*—the detention issue had not been litigated in the lower courts, apparently because the prosecution had never contended that the officers' conduct fell short of a detention. Therefore, seven judges of the Supreme Court resolved the case on the assumption that a detention had occurred. Of the seven, three—Justices Powell, Blackmun and the Chief Justice—found that there was sufficient articulable suspicion to justify a detention, and four—Justices White, Brennan, Marshall and Stevens—found that there was not. The two remaining judges—Justices Stewart and Rehnquist—concluded that the detention issue was not foreclosed despite the prosecution's failure to pursue it, and—without deciding the reasonable suspicion question—resolved the case in favor of the prosecution on the ground that no detention had occurred. As a result, the conviction in *Mendenhall* was affirmed by a five-to-four margin.

the name "Holt," while the driver's license carried his correct name, "Royer." When the officer asked about the discrepancy, Royer stated that a friend had made the reservation in the name "Holt." During this conversation, Royer became noticeably more nervous, and the officers then informed him "that they were in fact narcotics investigators and they had reason to suspect him of transporting narcotics." (*Ibid.*) At that point the officers, who still had Royer's airline ticket and identification, asked him to accompany them to a room adjacent to the concourse, about 40 feet away.

Without saying anything, Royer walked with the officers to the small room—described as a "large storage closet"—which contained a desk and two chairs. Without seeking Royer's consent, one of the officers retrieved the luggage which Royer had checked and brought it to the room. Royer then was asked if he would consent to a search of the suitcases. In response, Royer produced a key and unlocked one suitcase; an officer opened it and found a substantial quantity of marijuana. Royer then consented to the search of the second bag, in which, too, marijuana was found. The entire episode—from the time the officers first approached Royer to their discovery of the contraband—took about 15 minutes.

Before trial, Royer moved to suppress the evidence on Fourth Amendment grounds, the motion was denied and he was convicted of felony marijuana possession. On appeal, the Florida Court of Appeal reversed the conviction, holding (1) that the police did not even have sufficient information to constitute the articulable suspicion required to justify a limited detention and (2) that, in any event, the police conduct which preceded the consent exceeded the limited restraint permitted in a detention context. The state then appealed that decision to the United States Supreme Court.

In its decision in *Royer,* the high court disagreed with the Florida court on the "articulable suspicion" issue[8] but upheld the reversal of the conviction on the ground that the police had indeed exceeded the bounds of a limited detention—that, before he had consented to the search of his luggage, "[a]s a practical matter, Royer was under arrest." (— U.S. at p. — [75 L.Ed.2d at p. 240, 103 S.Ct. at p. 1327].) Although the ultimate holding in *Royer* thus turned on an issue—the line between a "detention" and an "arrest"—which is not involved in this case, the lead opinion in *Royer*

---

[8]In holding that there were articulable grounds for suspicion, the lead opinion in *Royer* stated: "We agree with the State that when the officers discovered that Royer was traveling under an assumed name, this fact, and the facts already known to the officers—paying cash for a one-way ticket, the mode of checking the two bags, and Royer's appearance and conduct in general—were adequate grounds for suspecting Royer of carrying drugs and for temporarily detaining him and his luggage while they attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention." (— U.S. at p. — [75 L.Ed.2d at p. 239, 103 S.Ct. at p. 1326].)

contains several passages which shed considerable light on the question which is at issue here—namely, the distinction between a "consensual encounter" and a "detention."[9]

First, in summarizing general Fourth Amendment principles, the lead opinion describes some of the more typical police actions that fall into the "consensual encounter" category. The opinion observes: "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations.] He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. [Citation.] If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." (— U.S. at p. — [75 L.Ed.2d at p. 236, 103 S.Ct. at p. 1324].)

Though this passage gives some indication of the attributes of a consensual encounter, it does not in itself set forth a clear constitutional standard for distinguishing such an encounter from a detention. That additional guidance is provided in a subsequent passage, where the lead opinion, in rejecting the state's contention that the "entire encounter was consensual," states: "Asking for and examining Royer's ticket were no doubt permissible in themselves, but when the officers identified themselves as narcotic agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. *These circumstances surely amount to a show of official authority such that 'a reasonable person would have believed that he was not free to leave.'*

---

[9]Although only four justices signed Justice White's lead opinion in *Royer,* Justice Blackmun, though dissenting on another issue, expressly signaled his general agreement with the lead opinion's analysis of the "consensual encounter"/"detention" issue. (— U.S. at pp. — —— [75 L.Ed.2d at p. 246-247, 103 S.Ct. at pp. 1332-1333].) Moreover, in his concurring opinion, Justice Brennan indicated that he would take a *narrower* view of those police activities that constituted consensual encounters than that expressed in the lead opinion. (*Id.* — U.S. at pp. ——— [75 L.Ed.2d at pp. 244-245, 103 S.Ct. at pp. 1330-1331].) Thus, it is evident that the lead opinion's views as to the *limits* on consensual encounters clearly enjoy majority support within the court.

*United States* v. *Mendenhall,* 446 U.S. 544, 554 (Opinion of Stewart, J.)." (Italics added.) (— U.S. at p. — [75 L.Ed.2d at p. 239, 103 S.Ct. at p. 1326].)

█ In light of the emphasized language and the citation of *Mendenhall,* it is now clear that a substantial majority—and perhaps all—of the Supreme Court justices agree with the standard set forth by Justice Stewart in his separate opinion in that case: "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[10] (*United States* v. *Mendenhall, supra,* 446 U.S. at p. 554 [64 L.Ed.2d at p. 509].) █ Thus, the question before us is whether, at the time Wilson consented to the search of his attache case, a reasonable person in Wilson's position would have believed that he was not free to leave.

Reviewing the facts of this case in light of this standard and the relevant portions of *Royer,* it is evident that Detective Kaiser did not detain Wilson, for federal constitutional purposes, merely by approaching him, identifying himself as a police officer, and asking if he might have a minute of his time. At that point, however, the officer did not simply ask Wilson if he would permit a search of his luggage. Instead, he advised Wilson that he was conducting a narcotics investigation and that he "had received information that he [Wilson] would be arriving today from Florida carrying *a lot of drugs.*" (Italics added.)

Common sense suggests to us that in such a situation, an ordinary citizen, confronted by a narcotics agent who has just told him that he has information that the citizen is carrying a lot of drugs, would not feel at liberty simply to walk away from the officer. Before Kaiser made that statement, Wilson might well have thought that the officer was simply pursuing routine, general investigatory activities, and might reasonably have felt free to explain to the officer that he had an important appointment to keep and did not have the time—or, perhaps, the inclination—to answer the officer's ques-

---

[10]Six members of the present court have either authored or joined in opinions explicitly endorsing the *Mendenhall* standard. Justices White, Marshall, Powell and Stevens signed the lead opinion in *Royer;* Justice Blackmun expressly approved that standard in his dissent in *Royer* (— U.S. at p. — [75 L.Ed.2d at p. 246, 103 S.Ct. at p. 1332]); and Justice Rehnquist joined in the relevant portion of Justice Stewart's opinion in *Mendenhall* itself. Of the three remaining justices, Chief Justice Burger joined Justice Powell's concurring opinion in *Reid,* which—at the least—strongly hinted at its approval of the *Mendenhall* test (448 U.S. at p. 443 [65 L.Ed.2d at p. 895]), and Justice Brennan appears to have applied the *Mendenhall* standard in his discussion of the detention issue in his concurring opinion in *Royer.* (— U.S. at p. — [75 L.Ed.2d at p. 245, 103 S.Ct. at p. 1331].) Only Justice O'Connor, who was not on the court when *Mendenhall* and *Reid* were decided, has not indicated her views on the issue.

tions or to comply with his requests for permission to search. Once the officer advised Wilson that he had information that Wilson was carrying a lot of drugs, the entire complexion of the encounter changed and Wilson could not help but understand that at that point he was the focus of the officer's particularized suspicion. Under these circumstances—and particularly in the absence of any clarifying advice from the officer explaining to Wilson that he was, in fact, free to drive away if he desired—no reasonable person would have believed that he was free to leave. (See *United States* v. *Berry* (5th Cir. 1982) 670 F.2d 583, 597; *United States* v. *Robinson* (5th Cir. 1980) 625 F.2d 1211, 1216-1217.)[11]

Accordingly, we conclude that Wilson was detained, within the meaning of the Fourth Amendment, when he consented to the search of his attache case. Of course, if—as Detective Kaiser represented—the police did in fact have additional information indicating that Wilson would be transporting narcotics, that information might well have provided a reasonable basis for the detention, in which case Wilson's consent would have been validly obtained. As we have explained, however, the prosecution—despite fair warning—failed to present the relevant testimony to substantiate the alleged information. On this record, we can only conclude that the police detained Wilson in violation of the Fourth Amendment, and that the trial court erred in failing to suppress the evidence obtained as a result of that illegal detention.[12]

---

[11]One commentator—in a thoughtful article on the general "seizure" question—has made this same point: "The nature of the questions asked by the officer during an encounter also may be relevant to the seizure issue. As questioning moves from general questioning concerning facts unrelated to a particular crime or class of crimes to questions indicating the officer's interest in a specific crime or class of crimes, the perception of the citizen reasonably may change from one of a voluntary encounter, from which he is free to disengage, to one of a formal police investigation of specific criminal activity, which he is not free to ignore. . . . In the absence of actual physical restraints or unequivocal verbal commands, a reasonable person examining the conduct of the officer is more likely to view the circumstances as a seizure when the conduct or verbal activities of the police become more intrusive, that is, when they clearly are related to the investigation of specific criminal acts. It is the threat of arrest and prosecution that produces the perception of restricted liberty in a police-citizen encounter, and that perception is more likely to arise when conduct of the police is linked to the investigation of specific criminal activity." (Williamson, *The Dimensions of Seizure: The Concepts of "Stop" and "Arrest"* (1982) 43 Ohio St.L.J. 771, 795, 802.)

[12]Although the People have not expressly conceded the point, they have not argued that the evidence should not be suppressed even if Wilson was illegally detained, on the theory that the evidence was not the "product" of the illegal detention. Since Wilson's consent followed within minutes of the detention, and since there were no intervening circumstances whatsoever, such a claim would, in any event, be untenable. (See *Royer, supra,* — U.S. at p. — [75 L.Ed.2d at p. 239, 103 S.Ct. at p. 1326]; *Dunaway* v. *New York* (1979) 442 U.S. 200, 216-218 [60 L.Ed.2d 824, 838-839, 99 S.Ct. 2248]; *Brown* v. *Illinois* (1975) 422 U.S. 590, 601-605 [45 L.Ed.2d 416, 425-428, 95 S.Ct. 2254].)

Let a peremptory writ of mandate issue, directing the trial court to vacate its order denying the motion to suppress and to enter a new order granting the motion.

Bird, C. J., Mosk, J., Richardson, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

The petition of real party in interest for a rehearing was denied November 23, 1983.