[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 379 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 380 
OPINION
Defendant Richard O'Neal Dean seeks reversal of the judgment of conviction below on the ground that the trial court should not have denied his motion to suppress evidence obtained in the course of a police traffic stop. We find that the prosecution, in opposing defendant's suppression motion, failed to meet its burden of proving that there was an articulable and reasonable suspicion that defendant committed a traffic violation based on the facts and circumstances known to the officer at the time of the traffic stop. Therefore, we reverse the judgment, and remand this matter for further proceedings.
 BACKGROUND The trial court sentenced defendant to three years eight months in state prison after he pled no contest to charges involving possession of cocaine, furnishing cocaine, possession of cocaine base for sale, possession of an assault weapon, and possession of a firearm. Defendant made his plea pursuant to a negotiated disposition after the trial court denied his motion to suppress evidence discovered as the result of a police traffic stop of a minivan defendant was driving in Bay Point, California.
 The Suppression Motion Hearing At the suppression motion hearing, the parties did not dispute that the registration tags displayed on the minivan's rear license plate were expired *Page 381 and a valid temporary operating permit sticker for the minivan had been issued by the Department of Motor Vehicles (DMV) as of the day of the traffic stop. The parties also did not dispute that the temporary operating permit was recovered from the minivan about three months after the stop. The parties did dispute whether the officer stopped the minivan because of the expired license plate tags, and whether the sticker was displayed in the minivan's rear window in a manner which eliminated any legitimate basis for the stop.
Testimony of Officer David Hall
 Officer David Hall, a law enforcement officer with the Contra Costa County Sheriff's Office, testified that he conducted the traffic stop. He was driving on patrol at approximately 3:34 p.m. on October 21, 2005, in Bay Point as a member of the "J team," "a county wide narcotics suppression unit that does selective patrolling within the Contra Costa County . . . limits." It was a clear day. Hall first saw the minivan as he drove behind it westbound on Willow Pass Road; it was possible that there was a vehicle between them. It was also possible that he made a U-turn just before he began following the minivan, but he could not recall one way or another whether he did so.
 Hall said that after his partner made a comment, he noticed the minivan had expired registration tags on its rear license plate. He could not recall if his partner told him something about "this van with expired registration" before or after making a U-turn. He followed directly behind the minivan when it turned south on Bailey Road, perhaps a car length or two away, and first saw the minivan's expired registration tags. He answered affirmatively when asked if he had "a pretty clear view into the interior of the van," and if he could "clearly see it appears there is only one person in the van" from a perspective "directly from the back looking in through the rear window."
 When asked if a red sticker, about four inches by four inches, with an "11" on it, was "affixed kind of in the middle of the rear window, a little to the left," Hall stated it was "possible," but he did not recall one way or the other. He knew such a sticker would have been a temporary registration, which gave the driver 30 days to the end of the month to fix whatever issues existed. Upon questioning by the court, Hall indicated again that he did not recall whether or not there was a red sticker on the rear of the minivan. He was in a position to see a sticker while he was following the minivan and, moreover, if he had seen such a sticker, it would not have affected his determination to pull the minivan over. On redirect, he testified that he was focused on the license plate as he drove behind the minivan, had a "fairly *Page 382 good view" of the back window of the vehicle as he followed behind it, and did not recall anything in the back window.
 Hall testified that he pulled the minivan over about a block after it turned onto Bailey Road. As the minivan pulled into a parking lot, he pulled in behind it, offset on the driver's side and probably half a car length behind. He left his vehicle before his partner and went directly to the driver's side door of the minivan. Hall then got his first look at defendant and recognized him. He acknowledged that, as a member of the "J team," he had authored and served a search warrant on defendant's address a few months before for evidence involving possession of marijuana for sale.[1]
 Hall testified that the first thing he asked defendant during the traffic stop was if defendant could provide registration and a driver's license, but that defendant was unable to provide either, searching his glove box but producing nothing. Hall asked defendant if he was still on parole after he asked defendant for his license and registration, and defendant said he was not. Hall thought defendant appeared very nervous, stammered and stuttered, and frequently broke eye contact with him. Hall asked defendant if he had anything illegal on his person, and defendant said no. When Hall asked to search defendant, defendant left his vehicle, turned around, and faced his vehicle with his hands up in the air, which Hall took to mean he could search defendant's person. Hall did so, and found what he believed was rock cocaine and marijuana. Defendant then grabbed a plastic baggy on top of the vehicle, threw it into a parking lot where his wife was located, and told her to get rid of the contents. Hall told her not to touch the baggy. He conducted another search of defendant and found 33 individually wrapped baggies containing what he believed was rock cocaine.
 Hall testified he did not recall defendant telling him that he had a temporary registration for the car. Hall did not recall having any conversation with defendant's wife, and did not recall anyone ever telling him the car had a temporary sticker in the window. He acknowledged that a report shown to him at the hearing, which had been prepared by another officer who had had the minivan impounded and towed, suggested that registration for the vehicle was present, but Hall did not recall talking with any officer about the registration of the vehicle that night or the next day. Later on the same day as the traffic stop, Hall prepared a warrant to search Dean's residence.
 Hall acknowledged he wrote in his report about the traffic stop that defendant said "no" in response to Hall's asking if he could search the minivan. Hall testified that when he asked defendant "if he would mind if I *Page 383 searched his vehicle or his person for any illegal items to which he replied no, as in no, he would not mind."
Testimony of the Department of Motor Vehicles Representative
 A representative from the Department of Motor Vehicles testified that the registration for a vehicle matching the description and license plate of the minivan had expired in August 2005. The registration amount had been paid in September, but the smog requirement remained pending, so a temporary operating permit was issued to a third party. The requirements for displaying such a sticker were as stated on the back of defense exhibit C, which was the temporary operating permit removed from the minivan's rear window, as discussed herein.
Testimony of Susan Crugnale
 Defendant's wife, Susan Crugnale, testified that at the time of the traffic stop she was in another car following behind defendant, who was driving the minivan home from an automobile transmission shop. She saw a police car make a U-turn and follow behind her, then follow behind defendant's car, and then pull defendant over. Crugnale identified defense exhibit C as the sticker that was in the minivan's rear window when it was stopped, which sticker she could see that day. She did not recall defendant throwing rock cocaine to her. She did not know that defendant had been convicted of inflicting corporal injury on a spouse or cohabitant in March 1997, and defendant had not ever hit her.
Testimony of the Tow Yard Owner
 Khurram Shah, the owner of the tow yard where the minivan was taken after the stop, testified that around the end of January 2006, he was directed by subpoena to produce the temporary sticker from the minivan. He personally removed the sticker from the minivan's interior rear window and provided it to defense counsel.
 Khurram testified that he first looked at the minivan in January 2006 in the company of the defense investigator, who took photographs of the back of the minivan from between five and seven feet away. It had recently rained. Khurram first noticed something in the minivan's rear window from 10 to 15 feet away and, since he was looking for it, realized it could be a temporary sticker. When he got close he saw the sticker's number. He recalled that the back window of the minivan was tinted, with a darker tint running around *Page 384 the window's outer portion. He also stated that a car is not washed while in the tow yard, and does become dirtier.
Testimony of the Defense Investigator
 Clayton Steacker, a private investigator employed by the defense and former police officer, testified that the tow yard owner took him to the minivan on January 24, 2006, a "rainy," "overcast day." The minivan's rear window "was definitely wet" and "a little dirty." The temporary sticker in the rear window was clearly visible from approximately 15 feet away.
 Steacker said he took photographs of the minivan, which were introduced into evidence as defense exhibits D and E. He could not recall specifically how far away from the minivan he was when he took the photographs, but said that it was "maybe 10 feet." The temporary sticker was clearly visible on the day he was there, and easier to see at the yard than it showed in the photographs he took. He could see into the interior of the minivan.
Testimony of the Tow Yard Manager
 Bashir Shah, the manager of the tow yard, testified that he towed the minivan to the tow yard on October 21, 2005. He recalled the prosecutor taking pictures of the minivan at the yard the day before his April 27, 2006 testimony. The photographs were admitted into evidence as the People's exhibits 2, 3, and 4.
 Bashir testified that he also accompanied the defense investigator when he took pictures of the minivan, on a day when it was raining. He saw the temporary sticker from zero to three to five feet away from the minivan, as soon as he was able to see the rear window. The lower portion of the minivan's rear window had a very dark factory tint. He said, "The tint makes anything inside a car hard to see. More importantly, a sticker like that, it made it harder to see it." He recalled some tape in the rear window's inside lower portion, where the tint was the darkest. The minivan was "moderately dirty" when the defense investigator visited, was "extremely filthy" inside when it was first taken into inventory, and was "extremely better" when the prosecutor came to the yard (the day before Bashir testified) because it had been sold and cleaned before being returned.
Testimony of Defendant
 Defendant testified that he was driving home from a transmission shop, heading westbound on Willow Pass Road in the minivan with his wife *Page 385 following in a car directly behind him, when a police car drove past him in the opposite direction. His wife had purchased the minivan from someone he did not know.
 Defendant said he saw the police car make a U-turn and get behind his wife's car. After he stopped, a police officer came over and said, "`Step out of the car. Give — I have a license to search this car' or something of the sort. I have some type of thing to search this car. `You are on parole.'" Defendant stepped out of the car. The officer did not ask him for license or registration. He did not tell the officer about the temporary sticker in the back of the minivan. He acknowledged swatting something off the top of the car.
 Defendant acknowledged that he had been convicted of a misdemeanor domestic violence incident with Crugnale in 1996 or 1997 and of inflicting corporal injury on another girlfriend in 2001. A month after the car incident, police searched his house and found an assault weapon there, as well as a .357 magnum in his wife's car.
Documentary Evidence
 Defense exhibit C[2] is a square piece of paper, approximately four inches by four inches, with instructions printed on one side. The other side is a dark pink color, and has printed in white, the title "temporary operating permit"[3] and a large "11." Tape on each side of the paper suggests it was once taped to something. The instructions on the back of defense exhibit C state in relevant part: "Place this permit inside the vehicle in one of the following locations: in the lower right corner of the rear window, in the lower right corner of the windshield, or on the rear side window behind the driver. Avoid placing it where it will block the driver's view of approaching traffic."
 Defense exhibits D and E are photographs which show the darkly tinted rear window of a white minivan from a moderate distance away. The rear window is dark and covered with a substantial amount of dirt. A grayish square of some kind is on the rear window's upper left side, apparently on the inside of the window. It is very difficult to make out anything more about the square. The number "11" is not clear, and not sufficiently visible to determine what it represents with any assuredness.
 People's exhibits 2 and 3 are photographs taken on a clear day of the minivan's rear window from close behind the minivan. In both photographs, *Page 386 the images of people, a structure, and sky reflected in the window are very clear and bright, while the inside of the minivan is dimly visible and dark.
 People's exhibit 5 is a document which indicates that defendant's driving privilege was suspended in 2002 by the Department of Motor Vehicles.
Closing Arguments
 The prosecutor argued that on the day of the stop, the temporary operating permit was placed in the most tinted part of the rear window, where the officers could not see it, that the rear window was tinted and reflective, that the rear license plate tags were expired, and that the window was likely dirtier on the day of the stop than the day the defense photographs were taken, soon after a rain. The prosecutor contended that defendant was not credible and his wife a victim of abuse in the past, implying her credibility was also in question.
 Defense counsel questioned Hall's honesty, arguing that Hall stopped defendant for a parole check after recognizing him from the previous search and later justified the stop with a story about the expired registration tags. Defense counsel also argued that the temporary operating permit was properly displayed and, therefore, even if Hall's testimony was true, he did not have a legitimate basis for the stop.
The Trial Court's Ruling
 The trial court denied defendant's suppression motion, both because it found that the stop "was not a problem" and that defendant had consented to the search. The court found that Hall's account was credible, defendant's account was not credible, and that defendant's wife was afraid, and testified in ways to help defendant. The court stated in relevant part:
 "I do think that the sticker was probably in the window in the place where the tow truck operator and the defense investigator saw it. However, I note that Defense Exhibit C is quite faded. And if you look at all of the pictures of the car taken by everybody, the one thing that is very clear is this is reflective glass. It's very hard to see anything inside. The defenses pictures make it very hard to see just what the document is. It's hard to see that it's red. It's certainly not obvious from the vantage point where it was taken what it was. It is not in the place that on the back of Defense Exhibit C and according to [the Department of Motor Vehicles where] the sticker is supposed to be. It is supposed to be in the lower right corner of the rear window. So an officer *Page 387 looking for a tag like this, is going to look in the lower right side of the window.
 "Even if the officer — a reasonable officer had been able to see through what is very clearly a reflective and tinted back window and seen a faded tag, I think that the officer would not necessarily have been able to conclude that this tag was a registration tag and, at that, a valid registration tag.
 "So I think that even had a reasonable officer seen it — and I believe the officer probably didn't see it. I think a reasonable officer couldn't see it. If a reasonable officer had noticed the tag, it would not necessarily tell the reasonable officer this is a legitimate tag. Therefore, where you have visible reflective in a place, you can see tags on the license plate that are clearly, and everybody agrees, out of registration time and you see maybe something in the window but probably nothing in the window, I think the officer has a probable cause at least to stop a vehicle or reasonable suspicion to stop a vehicle and do a brief detention to find out if somebody has registration.
 "I do believe that in this case, the officer was not able to see because of the conditions of the — because the thing was obscured and in the wrong place. And so I think that the stop was not a problem."
 The court further explained that given the conditions of the window and the tag, "[e]ven a reasonable officer looking for a tag wouldn't necessarily even know this was a tag much less be able to determine it was valid."
 The court also found that Hall, upon learning from defendant that he did not have a license, was justified in arresting defendant and searching him. The court believed, "as a matter of credibility," that defendant consented to the search.
 After sentencing, defendant filed a timely appeal. After the parties submitted their appellate briefs, we asked them to provide supplemental briefs addressing certain legal standards and testimony, or the lack thereof, by Officer Hall, which the parties provided.
 DISCUSSION I. Relevant Search and Seizure Law "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver `even though the purpose of the stop is limited *Page 388 and the resulting detention quite brief.'" (Brendlin v. California (2007) 551 U.S. ___ [168 L.Ed.2d 132, 127 S.Ct. 2400, 2406].) "`[P]ersons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers.' [Citation.] However, when there is articulable and reasonable suspicion that a motorist is unlicensed, that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, the vehicle may be stopped and the driver detained in order to check his or her driver's license and the vehicle's registration." (People v. Saunders (2006) 38 Cal.4th 1129, 1135
[45 Cal.Rptr.3d 66, 136 P.3d 859].)
 As the California Supreme Court has stated, "[t]he validity of a search does not turn on `the actual motivations of individual officers.' [Citation.] But whether a search is reasonable must be determined based upon the circumstances known to the officer when the search is conducted. `[A]lmost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him.' [Citations.]
 "The requirement that the reasonableness of a search must be determined from the circumstances known to the officer when the search was conducted is consistent with the primary purpose of the exclusionary rule — to deter police misconduct. The rule serves "to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it."' [Citation.] `The rule also serves another vital function — "the imperative of judicial integrity." [Citation.] Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions.'" (People v. Sanders (2003) 31 Cal.4th 318, 334 [2 Cal.Rptr.3d 630, 73 P.3d 496].)
 As our Supreme Court also has stated, "[t]he question for us, though, is not whether [the] vehicle was in fact in full compliance with the law at the time of the stop, but whether [the officer] had `"articulable suspicion"' it was not." (People v. Saunders, supra,38 Cal.4th at p. 1136.) The United States Supreme Court has made clear that "`[t]he fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, by itself, render the search unreasonable.' [Citations.] The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." (United States v. Sharpe (1985) 470 U.S. 675, 686-687 [84 L.Ed.2d 605,105 S.Ct. 1568].) *Page 389 
 Under California law, expired registration tabs on a vehicle's rear license plate can "be a violation of Vehicle Code section 4000, subdivision (a)(1), which requires the vehicle be currently registered; Vehicle Code section 4601, subdivision (a), which requires the vehicle's registration be renewed annually prior to the expiration of the registration year; and Vehicle Code section 5204, subdivision (a), which requires current registration tabs to be displayed on the rear license plate." (People v. Saunders, supra, 38 Cal.4th at p. 1135.) Our Supreme Court has "not yet decided whether an officer may stop a vehicle that has an expired registration tab but also displays a temporary operating permit." (Ibid.)
 Defendant moved to suppress evidence pursuant to Penal Code section 1538.5, which allows a defendant to meet "the initial burden of raising the issue of an unreasonable warrantless search or seizure by `simply assert[ing] the absence of a warrant and mak[ing] a prima facie showing to support that assertion.' [Citation.] After the defendant sufficiently raises the issue, it is the prosecution's burden to justify a warrantless search or seizure. [Citation.] A defendant then must present any arguments as to why that justification is inadequate." (People v. Smith (2002) 95 Cal.App.4th 283,296 [115 Cal.Rptr.2d 483].) In other words, "the burden of proving the justification for the warrantless search or seizure lies squarely with the prosecution." (People v.Johnson (2006) 38 Cal.4th 717, 723 [42 Cal.Rptr.3d 887, 133 P.3d 1044].)
 We apply a mixed standard of review. We review the trial court's factual findings for substantial evidence (People v. Wader (1993)5 Cal.4th 610, 640 [20 Cal.Rptr.2d 788, 854 P.2d 80]), and we do not question the trial court's judgments regarding witness credibility. (People v. Ramos (2004) 34 Cal.4th 494, 505 [21 Cal.Rptr.3d 575,101 P.3d 478].) However, "whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review." (People v. Saunders, supra, 38 Cal.4th at p. 1134.)
 II. Analysis Defendant argues the trial court's finding that Hall had sufficient cause to stop the minivan cannot be maintained because, even disregarding defendant's and his wife's testimony and believing Hall's, no substantial evidence supports such a conclusion. We agree. Put another way, the prosecution failed to meet its burden of proving a reasonable suspicion existed for stopping the minivan in light of Hall's testimony indicating his indifference about the minivan's possible display of a temporary operating permit and the lack of evidence that he looked for one before initiating the stop. *Page 390 
 As we have already discussed, Hall's actual motivations are not relevant to our determination of whether he had such an articulable and reasonable suspicion. (People v. Sanders, supra, 31 Cal.4th at p. 334.) Our determination of this question must be based upon "`an objective assessment of [Hall's] actions in light of the facts and circumstances then known to him.'" (Ibid.) Given the undisputed warrantless nature of the search involved, it was "the prosecution's burden to justify" Hall's actions (People v. Smith, supra, 95 Cal.App.4th at p. 296), i.e., to establish that he had an articulable and reasonable suspicion of a Vehicle Code violation.
 Defendant argues that "[t]he trial judge bent over backward to explain why Officer Hall could not have seen the temporary operating permit and how this excused his stopping the car. Officer Hall, however, actually testified that he did have a good view of the back of [defendant's] car and could see inside, that he would have seen a temporary operating permit if it were there, that he may in fact have seen a temporary operating permit, and that regardless of whether he saw a temporary operating permit, he was still going to stop [defendant's] car."
 In his supplemental brief, defendant argues that "Hall's suspicion that the minivan was unregistered — if indeed Officer Hall harbored such a suspicion — was patently unreasonable because he made not even the most cursory effort to determine whether it was registered or not," given that he "had no interest at all in whether the van bore a temporary registration sticker or not." Defendant concludes that "[u]nder these circumstances, the prosecution has failed to meet its burden of proof."
 Defendant's argument highlights Hall's indifference about a temporary operating permit. Hall's testimony, including his acknowledgment that he would have stopped the minivan regardless of whether he saw a temporary operating permit, that he knew about the significance of such a permit, that it was "possible" that one was affixed to the rear window, and that he could not recall whether or not he saw such a permit, indicates he was completely indifferent to the possibility of a temporary operating permit after he saw the minivan's expired registration tags. There is nothing in the record which indicates he looked for a temporary operating permit before initiating the stop. Hall did not testify that he looked for a temporary operating permit, and the prosecution failed to ask him whether he did so.[4] Hall's testimony also *Page 391 makes clear that he could have looked for a temporary operating permit without risk to his safety or endangering his pursuit of the minivan. Hall testified that he followed in his vehicle a car length or two directly behind the minivan in the middle of the afternoon on a clear day, long enough to follow the minivan as it turned onto Bailey Road and traveled about a block. He was able to observe the minivan's expired registration tags, had a "fairly good view" of the minivan's rear window, had a "pretty clear view into the interior," and could see well enough through it to observe that only one person was inside the minivan. Thus, Hall had ample opportunity to glance about the minivan's rear window for a temporary operating permit without delaying his movement or endangering himself in any way. Given these facts and circumstances, all of which were known to Hall at the time, Hall needed to look for a temporary operating permit as he followed the minivan in order to be able to form a reasonable suspicion that the minivan was not properly registered.
 The facts and circumstances of this case bear a significant resemblance to those discussed in People v. Nabong (2004) 115 Cal.App.4th Supp. 1 [9 Cal.Rptr.3d 854] (Nabong), which defendant cites in support of his arguments.[5] In Nabong, a police officer stopped the defendant in his vehicle after noticing an expired registration tag on the vehicle. (Nabong, at p. Supp. 2.) The officer also observed a temporary sticker for the current month on the rear window, but continued with the traffic stop because in his experience, about half of the temporary stickers on vehicles he had stopped were invalid. (Id. at p. Supp. 3.) The appellate court noted that the evidence was not in dispute, and that the only issue was one of law, that being whether "the facts present a reasonable suspicion that appellant violated the Vehicle Code. . . ." (Ibid.) The court answered this question in the negative, because the officer "made no effort to ascertain if in fact the temporary sticker was invalid by checking with his dispatcher" and did not have any particularized suspicion about the defendant committing a crime, regardless of his experience. (Id. at p. Supp. 4.) The Nabong court quoted favorably from an old, out-of-state case that "`[a]n officer is not warranted in relying upon circumstances deemed by him suspicious, when the means are at hand of either verifying or dissipating those suspicions without risk, and he neglects to avail himself of those means.'" (Id. at p. Supp. 4,[fn. 12, quoting Filer v. Smith (1893)96 Mich. 347, 355 [55 N.W. 999].) *Page 392 
 This portion of Nabong's analysis is directly relevant here. While Hall did not necessarily reject the significance of a temporary sticker, he did not necessarily look for one either, although he was aware that seeing one could eliminate his suspicions. He unquestionably had the means at hand to verify or dissipate his suspicions without any risk to his safety or his following the minivan — he needed merely to glance about the van's rear window as he followed behind. Under these circumstances, it would have been unreasonable for him not to recognize or pursue this avenue of investigation at all. (See United States v.Sharpe, supra, 470 U.S. at pp. 686-687.) Yet his testimony of indifference suggests this was the case. The prosecution's failure to establish that Hall at least looked for a temporary operating permit as he followed behind the minivan was critical in light of his expressed indifference and the prosecution's burden of proof.
 The People's effort to distinguish Nabong, supra, 115 Cal.App.4th Supp. 1, from the present case is unpersuasive. They argue the officer inNabong saw, but ignored, a registration sticker in the vehicle's window, while Hall "did not deliberately reject the significance of a temporary registration sticker," but, rather, "simply did not, or could not see whether the van had a temporary sticker . . . from his vantage point." The People ignore, however, that Nabong involved particular facts and circumstances from which the appellate court concluded the officer involved needed to have taken additional steps before a reasonable suspicion or illegal activity could have been formed.
 The People also argue that "[d]riving with expired registration is a Vehicle Code violation which justifies a traffic stop." We cannot adopt this broad argument. To do so would be to subject many thousands of Californians driving vehicles displaying temporary forms of registration — not only drivers like defendant, but also new vehicle owners who have not yet obtained permanent DMV-issued license plates — to unnecessary traffic stops that waste our law enforcement resources. As we have indicated, our duty is to examine the facts and circumstances known to an officer to determine from an objective standpoint whether an articulable and reasonable suspicion existed at the time of a particular traffic stop. (People v. Sanders, supra, 31 Cal.4th at p. 334.)
 Thus, the trial court should have granted defendant's motion to suppress because the prosecution did not meet its burden of proving the existence of a reasonable suspicion based on the facts and circumstances known to Hall at the time of the stop. Instead, the court disregarded the lack of evidence that Hall looked for a temporary operating permit, although the court's statement that "[e]ven a reasonable officer lookingfor a tag wouldn't necessarily even *Page 393 know this was a tag" suggests it recognized this evidentiary gap without appreciating its significance (italics added). Instead, the court concentrated on the evidence of the minivan rear window's dark, dirty, and reflective condition and the tag's fadedness to conclude that Hall probably did not see the temporary operating permit, and that a reasonable officer would not have seen it. These findings are inconsequential, however, without the prosecution establishing that Hall at least attempted to look for the temporary operating permit in the first place, given the facts and circumstances known to him at the time. Hall could not have formed a reasonable suspicion sufficient to initiate the stop without doing so, regardless of whether or not he would have seen one if he had tried. Thus, the trial court's denial of the motion was in error.
 Our holding is limited in two important respects. First, we do not intend to imply that officers who observe expired registration tabs have some sort of duty to look for an operating permit prior to conducting a traffic stop. Rather, we reach our conclusion here based solely on the particular facts and circumstances known to Hall at the time of this particular stop. As the Nabong court stated, "this court does not intimate that in every case police officers must investigate further given the opportunity to do so before a lawful detention or arrest may be made. Only in the context of this case's facts should that have happened." (Nabong,supra, 115 Cal.App.4th at p. Supp. 5,[fn. 12.)
 We also do not adopt defendant's argument that, as a matter of law, an officer who stops a vehicle with expired registration "must check for the temporary operating permit as soon as the stop is affected, and release the vehicle as soon as he determines that a temporary operating permit is in place." As we have already discussed, an officer is not required to use the least intrusive means possible to conduct a search. (UnitedStates v. Sharpe, supra, 470 U.S. at pp. 686-687.) Defendant proposes an overarching rule that could prove to be impractical in certain situations, and endanger the safety of officers approaching suspicious vehicles who are distracted by a need to search for a temporary operating permit. Here, for example, we do not hold that Hall should have looked for a temporary operating permit after he left his vehicle and approached the minivan. The evidence indicates this would have been impractical because, as Hall testified, he parked behind the minivan offset on the driver's side. It is reasonable to infer from this testimony that he did not have a good view of the minivan's rear window as he left the driver's side of his vehicle and approached the driver's side of the minivan. We see no reason why Hall should have done anything more than approach defendant directly under these circumstances. In light of our limited holding, however, *Page 394 we need not further address defendant's "matter of law" argument, or the numerous cases he cites.
 The People argue in the alternative that defendant's motion should have been denied because Hall's search was incident to defendant's arrest, relying on Chimel v. California (1969) 395 U.S. 752, 763 [23 L.Ed.2d 685, 89 S.Ct. 2034]. According to the People, Hall came upon defendant's car to investigate a registration violation and, upon defendant telling him he could not provide a valid driver's license, had probable cause to arrest defendant for driving without a valid license. Therefore, the ensuing search was legally justified as a search incident to arrest, based on the information then known to Hall. Defendant disagrees, arguing that the entire prosecution "was the fruit of a poisonous tree." Defendant is correct.
 Our independent research indicates that the appropriate question before us "`is "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [Citation.]' [Citation.] `Under Wong Sun [v.United States (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407]], evidence is not to be excluded merely because it would not have been obtained but for the illegal police activity. [Citation.] The question is whether the evidence was obtained by the government's exploitation of the illegality or whether the illegality has become attenuated so as to dissipate the taint. [Citation.]' [Citation.] [¶] Relevant factors in this `attenuation' analysis include the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct." (People v. Boyer (2006) 38 Cal.4th 412, 448-449 [42 Cal.Rptr.3d 677, 133 P.3d 581].)
 It is evident that the questioning of defendant, his arrest, and the search incident to his arrest occurred immediately upon his illegal detention, and was obtained by Hall's exploitation of that detention. The People fail to point to any attenuation sufficient to dissipate the resulting taint, and we conclude that none exists based upon the record before us.[6] *Page 395 
 DISPOSITION The trial court erred in denying the motion to suppress. The judgment is reversed, and this matter is remanded for further proceedings consistent with this opinion.
 Kline, P. J., and Richman, J., concurred.
[1] Hall did not find evidence of drug sales at the time.
[2]We have obtained from the superior court and examined defense exhibit C, the temporary operating permit, as well as the other exhibits that we refer to herein.
[3]We refer to this document herein as a temporary operating permit or temporary sticker.
[4]Hall testified he would have mentioned a temporary sticker in his report if he had seen one. This implies he did not do so and, therefore, that he did not see one. His report is not contained in the record, however. Furthermore, even if he did not mention a temporary sticker in his report, it would not mean that he looked for one, which is the key issue here.
[5] In his reply brief, defendant also cites People v. Hernandez (2006)146 Cal.App.4th 773 [53 Cal.Rptr.3d 66], but that case has since been granted review by our Supreme Court (Mar. 21, 2007, S150038) and depublished. Another case discussing a traffic stop of a vehicle with temporary registration, In re Raymond C. (2006) 145 Cal.App.4th 1320 [52 Cal.Rptr.3d 330], has also been granted review by the Supreme Court (Mar. 21, 2007, S149728).
[6]The People also refer to the trial court's finding that defendant consented to the search without arguing this finding should be an independent ground for affirming the trial court's denial of defendant's motion to suppress. Regardless, any consent provided by defendant under the circumstances was similarly tainted by the illegal detention. (SeeWilson v. Superior Court (1983) 34 Cal.3d 777, 790-791 [195 Cal.Rptr. 671,670 P.2d 325].) *Page 396