[No. B095820. Second Dist., Div. Seven. Oct. 25, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
LENDA DAUGHERTY, Defendant and Appellant.

278

**Counsel**

Maureen J. Shanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

John R. Gorey and Raymund F. Robles, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Defendant, Lenda Daugherty (Daugherty) appeals from a denial of a motion to suppress evidence pursuant to Penal Code section 1538.5. Upon denial of the motion to suppress, Daugherty pleaded nolo contendere to one count of the sale/transportation/offer to sell a controlled substance in violation of Health and Safety Code section 11352, and reserved her right to appeal the denial of the motion to suppress. On appeal, Daugherty contends the evidence was the fruit of an unlawful detention. We conclude Daugherty was not detained at the time police encountered her at the airport, and alternatively, if she was detained, the detention was lawful. We therefore affirm the judgment.

### FACTS AND PROCEEDINGS BELOW

On May 3, 1995, Detective James Gillespie (Gillespie), a Los Angeles Police Department narcotics unit investigator, was patrolling the Burbank Airport for possible drug couriers. At approximately 1:20 p.m. that day, Gillespie noticed Daugherty exiting a vehicle at the front of the terminal. The investigator was approximately 20 feet away from her.

Gillespie decided to observe Daugherty because he thought it unusual she did not exchange good-byes or remarks with the vehicle's occupants. Daugherty was carrying three bags: two new floral suitcases with locks and a dark fold-over carry-on bag. None of the bags had identification tags.

Daugherty approached the skycap area where she proceeded to have her luggage checked. Gillespie heard Daugherty tell the skycap her name was Linda Washington and when asked to place identification tags on the bags, she said, "no." At this point, Gillespie was standing three feet behind Daugherty at the skycap area. Daugherty appeared startled by the skycap's request to place identification on her bags. She subsequently wrote only the initials "T.C." on both tags. The skycap asked Daugherty to place more information on the tags and, after hesitating for a moment, Daugherty placed the name "Linda Washington" on the tags and nothing else. The skycap then checked the two locked floral suitcases. Gillespie also noticed Daugherty was traveling to Detroit, a city known to receive illegal narcotics supplies from Los Angeles.

Daugherty walked inside the terminal, but had to return to the skycap area to get the dark fold-over bag she apparently had forgotten. After retrieving

her bag, Daugherty went to the women's restroom. At this point, Gillespie notified his partners he suspected Daugherty of transporting narcotics through the airport.

Gillespie approached Daugherty as she left the restroom. At this point, they were standing at the main entrance way located in the middle of the airport. Gillespie identified himself as a police officer, showed Daugherty his police identification card, and asked to speak with her for a moment. Daugherty looked at the identification card and spoke to Gillespie. At this point, Gillespie advised Daugherty she was not under arrest, she was free to go at any time, and she did not have to speak with him. Gillespie stated he had some questions for her if she did not mind.

Gillespie then asked Daugherty for identification, which she did not have. He asked her name and she replied, "Linda Washington." Upon request, Daugherty handed Gillespie her airline ticket, which was a one-way ticket to Detroit purchased a day earlier at the Fox Hills Travel Agency, an agency located near Los Angeles International Airport. After looking at the airline ticket, Gillespie handed it back to Daugherty.

After returning the ticket to Daugherty, Gillespie advised he and his partner both worked in the narcotics unit at the Burbank Airport and they only interviewed people whom they suspected of transporting narcotics through the airport. He asked her if she was carrying any drugs in her carry-on bag, and Daugherty replied "no." Daugherty then asked Gillespie if he wanted to look at her carry-on bag. A subsequent search revealed nothing. Gillespie then requested permission to search the two floral bags Daugherty had just checked. Daugherty appeared nervous at this time and avoided any further eye contact with Gillespie by looking at the ground. When asked a second time for consent to search the other bags, Daugherty refused.

After Daugherty refused consent to search the other two bags, Gillespie informed her he suspected her of transporting narcotics. He advised her she was going to be detained until a narcotics dog could sniff her bags. It was approximately 1:40 p.m. at the time Gillespie advised Daugherty of the detention. This was 20 minutes after Daugherty arrived, but 10 minutes of this time she was in the restroom. Gillespie escorted Daugherty to the police office, which was 60 yards from where they were standing. One of Gillespie's partners brought Daugherty's checked bags to the police office. Gillespie's partner also brought a dog to the office. The dog sniffed Daugherty's bags and alerted the officers to the presence of narcotics in both bags. Gillespie then arrested Daugherty.

A search of the bags pursuant to a warrant revealed 3.0022 kilograms of cocaine.

After the trial court denied her motion to suppress evidence of the cocaine pursuant to Penal Code section 1538.5, Daugherty pleaded nolo contendere to a violation of Health and Safety Code section 11352. The trial court sentenced Daugherty to the low term of three years.

## DISCUSSION

### I. *Standard of Review of Suppression Motions Under Penal Code Section 1538.5.*

■ There is a dual standard of review on appeal: The trial court's factual findings as to how the challenged detention occurred will be upheld if they are supported by substantial evidence. *(People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].) However, an appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision whether or not a detention is reasonable. Instead, the appellate court's responsibility is to independently measure the facts against the constitutional standard of reasonableness. *(People* v. *Leyba, supra,* 29 Cal.3d at p. 597.) Under Proposition 8, we apply federal law but utilize state law where there is no conflict. *(In re Lance W.* (1985) 37 Cal.3d 873, 886-888 [210 Cal.Rptr. 631, 694 P.2d 744].)

### II. *The Trial Court Properly Denied Daugherty's Penal Code Section 1538.5 Motion.*

■ ■ ■ ■ Daugherty argues she was unlawfully detained when Gillespie confronted her as she exited the restroom, and therefore, the trial court erred in denying her motion to suppress pursuant to Penal Code section 1538.5. We disagree.[1]

As an initial matter, we note there were three distinct stages in Daugherty's interaction with the police. The first involved the initial contact between

---

[1]As an initial matter, we discuss the police officer's use of a dog to sniff Daugherty's checked bags for narcotics. It is well settled by *United States* v. *Place* (1983) 462 U.S. 696 [77 L.Ed.2d 110, 103 S.Ct. 2637] and our own high court's decision in *People* v. *Mayberry* (1982) 31 Cal.3d 335 [182 Cal.Rptr. 617, 644 P.2d 810], a dog "sniff" is not a search requiring any level of objective justification under the Fourth Amendment. As the high court noted in *Place,* "A 'canine sniff' by a well-trained narcotics detection dog . . . does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view. . . . Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. . . . [And] the information obtained is limited. . . . [¶] We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *(United States* v. *Place, supra,* 462 U.S. at p. 707 [77 L.Ed.2d at p. 121].)

We note, however, this is not a case where Daugherty's bags were sniffed by dogs at random in a public place after an observation of Daugherty's general behavior or independent of her detention by Gillespie. Had that been the case, it is clear no objection could be made

Gillespie and Daugherty which we address immediately below. The second stage occurred when Gillespie advised Daugherty he and his partner were narcotics officers who only interviewed people they suspected of transporting narcotics. Finally, there was the formal detention when Gillespie detained Daugherty and took her to the police office. We discuss each stage in turn.

A. *The Initial Contact Between Daugherty and Gillespie Was Not a Detention Requiring Any Objective Level of Justification.*

The California Supreme Court in *In re James D.* (1987) 43 Cal.3d 903, 911-912 [239 Cal.Rptr. 663, 741 P.2d 161], quoting at length from the high court's decision in *Florida* v. *Royer* (1983) 460 U.S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319], delineated the different types of police contacts ranging from the least to the most intrusive. " 'First, there are . . . "consensual encounters" (*id.*, [460] U.S. at p. [506] [75 L.Ed.2d at p. 243]), which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever . . . and which may properly be initiated by police officers even if they lack any "objective justification." (*Id.*, [*Florida* v. *Royer, supra,*] [460] U.S. at p. [497 (75 L.Ed.2d at p. 236)].) Second, there are what are commonly termed "detentions," seizures of an individual strictly limited in duration, scope, and purpose, and which may be undertaken by the police "if there is an articulable suspicion that a person has committed or is about to commit a crime." (*Id.*, [460] U.S. at p. [498 (75

to the challenged evidence. (See *United States* v. *Harvey* (8th Cir. 1992) 961 F.2d 1361, 1363-1364 [where luggage was moved from overhead racks to floor so drug dogs could sniff it, the court held no seizure requiring reasonable suspicion had occurred because the luggage was not taken directly from the defendants' custody, but was moved from one public place to another and such temporary removal of the bags caused no delay to their travel, and, thus, no meaningful interference with their possessory interests]; *United States* v. *Johnson* (9th Cir. 1993) 990 F.2d 1129, 1132-1133 [removing checked bag from luggage on tarmac to airport office was not a seizure because there was no interference with defendant's possessory interest, as the bag was scheduled to leave on next flight two hours later]; *State* v. *Goodley* (Fla.Dist.Ct.App. 1980) 381 So.2d 1180, 1182 [the "slight movement" of defendant's suitcase, checked with airline, from cart to floor to facilitate examination by narcotics dog "did not even remotely amount to a Fourth Amendment seizure"]; 3 LaFave, Search and Seizure (2d ed. 1987) § 9.6(e), p. 587 et seq.; *id.* (1995 cum. supp.) pp. 215-221].)

Had Gillespie simply ordered the dog sniff of Daugherty's bags while they were at the skycap area or on the tarmac, the use of a narcotics dog clearly would not be objectionable.

The problem presented in this case differs from the above since Gillespie did not target the checked suitcases for sniffing until he made contact with Daugherty outside the restroom and engaged her in conversation. In other words, the decision to obtain a narcotics dog to sniff Daugherty's checked luggage was the direct product or "fruit" of what took place between Gillespie and Daugherty during the alleged detention. Therefore, the lawfulness of the dog sniff rises or falls on the lawfulness of the encounter between Gillespie and Daugherty. Because we hold the encounter was not a detention, or alternatively, assuming it was a detention, it was lawful because based on reasonable suspicion, we find the dog sniff to be lawful as well.

L.Ed.2d at pp. 236-237)].) Third, and finally, there are those seizures of an individual which exceed the permissible limits of a detention. . . . *(Id., [460] U.S. at p. [499 (75 L.Ed.2d at p. 237)].) (Wilson v. Superior Court (1983) 34 Cal.3d 777, 784 [195 Cal.Rptr. 671, 670 P.2d 325].)' " (In re James D., supra,* 43 Cal.3d at pp. 911-912.)

In *Wilson v. Superior Court* (1983) 34 Cal.3d 777 [195 Cal.Rptr. 671, 670 P.2d 325] Justice Kaus, writing for a unanimous court, adopted the holding and rationale of the United Stated Supreme Court's decision in *Florida v. Royer, supra,* 460 U.S. 491 in determining when the line has been crossed between a consensual encounter and a detention. *Royer* involved the detention and arrest of a person who matched a law enforcement "drug courier profile." The high court's lead opinion in *Royer* noted: "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual . . . in [a] public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen. . . . [Citations.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. . . ." *(Wilson v. Superior Court, supra,* 34 Cal.3d. at p. 789, citing *Florida v. Royer, supra,* 460 U.S. at p. 497 [75 L.Ed.2d at p. 236].)

The *Wilson* court also concluded the appropriate test for determining whether a person has been detained under the Fourth Amendment is the standard first articulated by Justice Stewart in his separate opinion in *United States v. Mendenhall* (1980) 446 U.S. 544 [64 L.Ed.2d 497, 100 S.Ct. 1870]: " '[A] *person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' (United States v. Mendenhall* [(1980)] 446 U.S. [544] at p. 554 [64 L.Ed.2d at p. 509].)" (34 Cal.3d at p. 790, fn. omitted, italics added.)

██ Daugherty argues she was detained for purposes of the Fourth Amendment when Gillespie approached her outside the women's restroom. However, the contact between Daugherty and Gillespie at this point was what the *Royer* court would term a "consensual encounter." Gillespie identified himself and advised Daugherty she was not under arrest, she was free to go at any time, and she did not have to talk with him. As the court in *People v. Profit* (1986)183 Cal.App.3d 849, 877 [229 Cal.Rptr. 148] noted, ". . . the delivery of warnings weighs heavily in favor of finding voluntariness and consent."

Daugherty argues, however, the language used by Gillespie at the end of the warning converted the consensual encounter into a detention because a

reasonable person would believe she had no choice but to remain and answer Gillespie's questions. From the record, it appears Gillespie ended his warning with "but, in fact," he had some questions for her if she didn't mind. We fail to see how such words vitiate the nature of the warning given by Gillespie. The words merely convey Gillespie's desire to speak with Daugherty, nothing more. (Cf. *People* v. *Jones* (1991) 228 Cal.App.3d 519, 523 [279 Cal.Rptr. 56] [an officer's actions and speech "Stop. Would you please stop" would lead a reasonable person to believe he was not free to leave]; *People* v. *Verin* (1990) 220 Cal.App.3d 551, 557 [269 Cal.Rptr. 573] [officer's command to defendant "Hold it, Police" or "Hold on, Police" constituted a detention since the defendant reasonably had to comply with the officer's demand].)

Therefore, we hold the initial contact between Daugherty and Gillespie was a consensual encounter which does not require any objective justification.

> B. *Daugherty Was Not Detained When Gillespie Advised Her He Was a Narcotics Officer Who Only Interviews Possible Suspects, and Assuming She Was Detained, Gillespie Nevertheless Had Reasonable Suspicion.*

 Daugherty further contends Gillespie detained her when he advised her he and his partner were narcotics officers who only interviewed people they suspected of transporting illegal narcotics through the airport. In addressing this argument, a comparison to the facts of *Wilson* v. *Superior Court, supra,* and *Florida* v. *Royer, supra,* is helpful.

In *Wilson,* a narcotics officer told the defendant he was conducting a narcotics investigation and had information the defendant was carrying a lot of drugs from Florida to Los Angeles. The officer's accusation the defendant was a suspect was found dispositive: "Common sense suggests to us that in such a situation, an ordinary citizen, confronted by a narcotics agent who has just told him that he has information that the citizen is carrying a lot of drugs, would not feel at liberty simply to walk away from the officer." (*Wilson* v. *Superior Court, supra,* 34 Cal.3d at p. 790.)

In *Royer,* the defendant consented to a search of his luggage when agents identified themselves as narcotics agents, told him they suspected him of transporting narcotics, and asked him to accompany them to the agents' office while retaining his driver's license and plane tickets and without indicating he was free to depart. The high court held such action constituted a detention for which the agents needed reasonable suspicion. (*Florida* v. *Royer, supra,* 460 U.S. at p. 503 [75 L.Ed.2d at p. 240].)

In the instant case, Gillespie identified himself as a narcotics officer and informed Daugherty he and his partner only interviewed people they suspected of transporting narcotics. He did not accuse Daugherty of transporting narcotics until she later refused consent to search the two checked floral bags after allowing the search of her carry-on bag. Thus, there was no direct accusation Daugherty was, in fact, a suspect. Additionally, Gillespie did not retain Daugherty's airline ticket or her bags. There was no display of a weapon, no physical touching of her person, and no use of language or tone of voice indicating compliance with the officer's request was required. (See *United States* v. *Mendenhall, supra,* 446 U.S. at pp. 554-555 [64 L.Ed.2d at pp. 509-510].)

Under these circumstances, we conclude a reasonable person would have felt free to leave the officer and walk away. What the investigator did in this situation was identify himself and tell Daugherty the nature of his work. He did not directly accuse Daugherty of transporting narcotics, which may have been sufficient to convert the encounter into a detention. (*People* v. *Lopez* (1989) 212 Cal.App.3d 289, 292-293 [260 Cal.Rptr. 641] [no detention even though questions asked by police officer were somewhat accusatory].) Under the *Mendenhall* standard, Gillespie's statement would fall short of a detention because there was nothing indicating Daugherty's compliance was required. (*United States* v. *Mendenhall, supra,* 446 U.S. at pp. 554-555 [64 L.Ed.2d at pp. 509-510].) The investigator did not accuse her of transporting drugs, did not retain her airline ticket or her bag, and did not change the tone of the conversation.

Assuming Gillespie did detain Daugherty when he advised he and his partner only interview people they suspect of transporting narcotics, we nevertheless conclude Gillespie had reasonable suspicion to warrant such detention.

A detention is constitutionally reasonable if the circumstances known or apparent to the detaining officer include "specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and same involvement by the person in question." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].)

Here, there were a number of factors justifying the detention. There were no good-byes or gestures exchanged between Daugherty and the occupants of the vehicle which dropped her off. Daugherty carried three bags: two new floral bags with locks and a non-matching dark fold-over bag. None of the bags had identification tags. Daugherty originally placed only the initials "T.C." on the identification tags, initials which did not match the name she had given the skycap. When asked to place more information on the tags, she placed only the name "Linda Washington." Daugherty had no identification with her despite the rather long trip she was taking. Consequently, the officers could not establish whether she was "T.C.," "Linda Washington," or someone else. She was traveling on a one-way ticket purchased at an agency near Los Angeles International Airport but was leaving from Burbank Airport. She was going to Detroit, a city known to be supplied with drugs from Los Angeles. Based on the totality of the circumstances, we find Gillespie had ample reasonable suspicion to justify a detention of Daugherty based on the above facts.

Of particular significance was the fact Daugherty could not produce identification. There was no way for Gillespie to verify if she was "T.C." or "Linda Washington." When considering the long trip from Los Angeles to Detroit, it seems peculiar to say the least that a person would not have identification with her. Without identification, a person may not cash a check, obtain a hotel room, rent a car, or do a whole host of activities normally undertaken by travelers. Additionally, Daugherty's placement of the initials "T.C." on her identification tags warranted Gillespie's brief detention. These initials have no apparent relationship to the name she gave the skycap. Furthermore, Daugherty was unable to explain the discrepancy.

Daugherty argues *United States* v. *Sokolow* (1989) 490 U.S. 1 [104 L.Ed.2d 1, 109 S.Ct. 1581] controls our decision, and the high court's dictum the destination of the defendant alone is not enough to constitute reasonable suspicion compels reversal. We agree a traveler's destination alone is not enough to constitute reasonable suspicion to justify a detention. However, in this case there were numerous other circumstances to raise a reasonable suspicion than the mere fact she was traveling to Detroit. In fact, in the *Sokolow* case the court found reasonable suspicion to detain the defendant based on the totality of the circumstances when looking at the following facts: the defendant paid $2,100 from a roll of $20 bills for 2 round-trip tickets; he traveled under a name that did not match the name under which his telephone number was listed; his original destination was Miami, a source city for drugs; he stayed in Miami only 48 hours even though a round-trip flight from Honolulu to Miami takes 20 hours; he

appeared nervous; and he checked none of his luggage. (*United States* v. *Sokolow*, *supra*, 490 U.S. at pp. 9-10 [104 L.Ed.2d at pp. 11-12].)

As mentioned above, we agree with the *Sokolow* court destination alone does not afford an adequate basis for detaining an individual. But it is clear from the above analysis Detective Gillespie relied on the observance of many facts beyond Daugherty's destination of Detroit as his basis for detaining her.

In summary, it is apparent Gillespie's actions fall short of what is necessary under current standards to constitute a detention. However, assuming there was a detention when Gillespie advised Daugherty he only interviews probable suspects, we hold the officer had ample reasonable suspicion to warrant such detention.

### C. *Daugherty's Formal Detention Was Constitutionally Reasonable Because Gillespie Had Reasonable Suspicion to Detain Daugherty After She Refused Consent to Search the Two Checked Floral Bags.*

As to the third stage when Gillespie instructed Daugherty to accompany him to the police office, we believe Gillespie had reasonable suspicion to justify detaining Daugherty based on the totality of the circumstances. In addition to the observations made earlier, Daugherty's refusal to consent to a search of the checked bags after allowing a search of her carry-on was enough to cause a reasonable police officer with Gillespie's 10 years of experience in the narcotics unit to suspect Daugherty of transporting drugs in the checked luggage.

Daugherty contends the above mentioned facts have innocent explanations, and thus a string of innocent facts leads to an innocent conclusion. However, when reviewing a trial court's determination of the existence of reasonable suspicion, a reviewing court must look at the totality of the circumstances. (*United States* v. *Sokolow*, *supra*, 490 U.S. at p. 9 [104 L.Ed.2d at pp. 11-12].) Even if the circumstances are also consistent with innocent activity, a detention will be justified if the combination of circumstances also supports a reasonable suspicion of criminal activity. (*In re Tony C.*, *supra*, 21 Cal.3d 888, 894.) A comparison to cases where the court found reasonable suspicion lacking is illustrative.

Daugherty contends the facts of the present case are sufficiently devoid of criminal activity so as to be analogous to the situation in *People* v. *Roth*

(1990) 219 Cal.App.3d 211 [268 Cal.Rptr. 66]. In *Roth*, the police detained the defendant solely on the grounds of his early morning presence in the deserted parking lot of a shopping center whose businesses were closed. The court held the detention was unlawful because the defendant's mere presence was devoid of any indicia of involvement in criminal activity. (*People* v. *Roth*, *supra*, 219 Cal.App.3d at 215.)

Similarly, Daugherty argues *People* v. *Verin*, *supra*, 220 Cal.App.3d 551 compels the conclusion there was no reasonable suspicion for her detention. In *Verin*, the police stopped the defendant because he was leaving an area which was under surveillance for drug activity. The detaining officer made no personal observations of the defendant's activity before stopping him. The court held the defendant's activity of walking down a street at 7:25 p.m. from a location then under surveillance in a high-crime area did not constitute a specific and articulable suspicion justifying the defendant's detention. (*People* v. *Verin*, *supra*, 220 Cal.App.3d at p. 558.)

We think the facts in the instant case afford a stronger basis for finding the existence of reasonable suspicion than was presented in either *Roth* or *Verin*. Here, Gillespie observed Daugherty place only the initials "T.C." on her bags, initials that bear no resemblance to the name she had given the skycap. When asked for more information, she simply placed the name "Linda Washington" on the bags and nothing else. She forgot her carry-on bag and appeared nervous. She carried no identification with her despite the long trip, making determination of her actual identity difficult; and, she was traveling on a one-way ticket to Detroit, a destination the officer knew was supplied by drug couriers from Los Angeles.

This was not a case where the detaining officer simply stopped the defendant because she was going to a supplied city or where the officer made no personal observations of the defendant. Detective Gillespie based his detention of Daugherty on specific and articulable facts justifying Daugherty's detention. The fact these circumstances may have an innocent explanation does not invalidate the detention. (*In re Tony C.*, *supra*, 21 Cal.3d at p. 894.) Indeed, police officers are required to investigate any possible involvement in criminal activity in order to dispel any such suspicions. (*Ibid.*) It is apparent to us Detective Gillespie's detention of Daugherty was based on something more than just "mere curiosity, rumor, or hunch" and is thus sufficient to constitute reasonable suspicion justifying Daugherty's detention. (*Id.* at p. 893.)

While we believe there was no detention until Daugherty was ordered to the police office, assuming the detention did occur earlier, we also are of the

opinion the investigator had reasonable suspicion at that earlier point based on the reasons explained above. Accordingly, we conclude the trial court did not err in denying Daugherty's motion to suppress under Penal Code section 1538.5

DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Woods, J., concurred.