Filed 12/17/14  P. v. Latchman CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JASON ALI LATCHMAN,<br><br>Defendant and Appellant. | B253042<br><br>(Los Angeles County<br>Super. Ct. No. BA410416) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Monica Bachner, Judge.  Reversed and remanded with directions.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following the denial of his motion to suppress evidence, Jason Latchman pleaded no contest to one count of carrying a loaded and unregistered firearm.[1] On appeal Latchman contends a police officer's seizure of a handgun found in his pocket was the product of an unlawful detention. Concluding Latchman was unlawfully detained based upon an anonymous tip, we agree the gun should have been suppressed and reverse.[2]

**FACTUAL AND PROCEDURAL BACKGROUND**

Los Angeles Police Officer Sinkovits testified at the suppression hearing that shortly after midnight on April 21, 2013, he and his partner, officer Luis Rivera, responded to an anonymous report of two individuals spray-painting the sidewalk at the intersection of 36th Place and Halldale Avenue. The suspects were described as two Black men, one wearing a white shirt and white cargo shorts and the other wearing a black shirt and blue jeans. The officers arrived at the intersection five to ten minutes after receiving the report and found no one there. They decided to look for the suspects and drove around the area, known to be frequented by gang members who typically carry weapons. The officers came upon two men matching the description of the vandalism suspects, who were standing outside a nightclub about three blocks from the intersection of 36th Place and Halldale Avenue.

When the officers drove up, Sinkovits "made eye contact" with the suspects and one of them ran inside the nightclub. Sinkovits quickly detained the remaining suspect, Latchman, who was wearing a black shirt and blue jeans. Sinkovits testified he immediately conducted a pat search of Latchman for weapons because officers had been told earlier in the day about a feud between rival gangs in the area. Sinkovits recovered a handgun from the back pocket of Latchman's jeans and arrested him.

---

[1] Pursuant to the plea agreement, Latchman was sentenced to the lower term of 16 months in county jail.

[2] Because we conclude the detention was unlawful, we need not address Latchman's additional contention the pat search was not justified.

Latchman did not testify at the suppression hearing. The defense presented the testimony of Iris Dawson, a 911 dispatch police service representative, who retrieved the audio recording of the anonymous telephone call made on April 20, 2013 about the two vandalism suspects. The recording was played for the trial court and a transcript of the telephone call was admitted into evidence. According to the transcript, the anonymous caller reported that he or she did "not want to get too close" to the suspects while watching them spray paint "all over" the sidewalk. The caller also stated the suspects would drop the spray cans "onto any property" when a car passed by and then pick them up and resume their activity. The caller did not indicate that the vandals had left the scene, or provide any information that would predict their future behavior.

Following argument by counsel and supplemental briefing, the trial court denied the motion to suppress, finding Latchman had properly been detained based on what Officer Sinkovits knew at the time. An anonymous caller had reported a specific crime as he or she was witnessing it: Two individuals were spray-painting a sidewalk with graffiti, occurring at a specific location, a named intersection, at around midnight. Finding nothing at the intersection, the officers properly began a search and within blocks discovered two men, Latchman and his companion, whose physical description matched the information received from the anonymous caller. When the officers made eye contact with the men, one of them fled. The court concluded Sinkovits and his partner had reasonable suspicion at that point to detain Latchman for a vandalism investigation.[3]

## DISCUSSION

1. *Standard of Review*

In reviewing the ruling on a motion to suppress, the appellate court defers to the trial court's factual findings, express or implied, when supported by substantial evidence. (*People v. Redd* (2010) 48 Cal.4th 691, 719 (*Redd*); *People v. Ayala* (2000) 23 Cal.4th

---

[3] The court also found the pat search of Latchman for officer safety was justified because Officer Sinkovits had specific information that rival gangs were feuding in the area, and the subsequent seizure of the handgun from Latchman was proper.

225, 255; *People v. James* (1977) 19 Cal.3d 99, 107 (*James*).  The power to judge credibility, weigh evidence and draw factual inferences is vested in the trial court.  (*Ibid.*) However, in determining whether, on the facts found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.  (*Redd*, p. 719; *People v. Glaser* (1995) 11 Cal.4th 354, 362.)

### 2.  *The Trial Court Improperly Denied Latchman's Motion to Suppress*
#### a.  *The law governing detentions justified by an anonymous tip*
##### (i)  *The requirement of reasonable suspicion for a detention*

Police contacts with individuals fall into "three broad categories ranging from the least to the most intrusive:  consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty."  (*In re Manuel G.* (1997) 16 Cal.4th 805, 821; see *People v. Hughes* (2002) 27 Cal.4th 287, 327-328.)  A detention occurs within the meaning of the Fourth Amendment when the officer, by means of physical force or show of authority, in some manner temporarily restrains the individual's liberty.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 341; *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 789-790; *People v. Souza* (1994) 9 Cal.4th 224, 231.)  There is no dispute in this case that Officer Sinkovits detained Latchman.

Officer Sinkovits's detention of Latchman and the subsequent seizure of the handgun from his person were valid only if Sinkovits had a reasonable, articulable suspicion Latchman had been, currently was or was about to be engaged in criminal activity.  (*Terry v. Ohio* (1968) 392 U.S. 1, 21 [88 S.Ct. 1868, 20 L.Ed.2d 889]; *People v. Wells* (2006) 38 Cal.4th 1078, 1083.)  "The officer's subjective suspicion must be objectively reasonable, and 'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith.'"  (*Wells*, at p. 1083, accord, *United States v. Sokolow* (1989) 490 U.S. 1, 7 [109 S.Ct. 1581, 104 L.Ed.2d 1].)  In evaluating whether the standard of objective

4

reasonableness has been satisfied, we must examine the "totality of the circumstances" in each case to determine whether a "particularized and objective basis" supports the detention. (*United States v. Cortez* (1981) 449 U.S. 411, 417-418 [101 S.Ct. 690, 66 L.Ed.2d 621]; see *People v. Souza* (1994) 9 Cal.4th 224, 231 [police officer must "point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity"].) "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' [Citations.] Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, [citation], the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." (*United States v. Arvizu* (2002) 534 U.S. 266, 273-274 [122 S.Ct. 744, 151 L.Ed.2d 740].) If the officer has such an objectively reasonable suspicion, a defendant's motion to suppress evidence seized in a search incident to the detention is properly denied. (*People v. McDonald* (2006) 137 Cal.App.4th 521, 530; *People v. Daugherty* (1996) 50 Cal.App.4th 275, 288-289.)

(ii) *United States Supreme Court decisions on anonymous tips*

The United States Supreme Court has expressly considered when an investigative detention based on an anonymous tip is justified. In *Florida v. J. L.* (2000) 529 U.S. 266 [120 S.Ct. 1375, 146 L.Ed.2d 254] (*J.L.*) an anonymous telephone caller told the police a young Black man standing at a specific bus stop and wearing a plaid shirt was carrying a gun. Officers responding to the scene saw three young Black men at the bus stop, one wearing a plaid shirt. Aside from the anonymous tip the officers had no reason to suspect the men of illegal conduct. The officer did not see a firearm and none of the men engaged in any threatening or unusual behavior. The officers approached the individual in the plaid shirt, ordered him to raise his hands and frisked him; they found a gun in his pocket. (*Id.* at p. 268.)

5

The Supreme Court held the pat search and subsequent seizure of the gun violated the Fourth Amendment: "[T]he officers' suspicion that [the defendant] was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, [citation], 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" (*J.L., supra*, 529 U.S. at p. 270.) Recognizing "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop,'" the *J.L.* Court found no such indicia in the case before it. (*Ibid*.) "All the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]." (*Id.* at p. 271.) The fact the tip was corroborated as to the "subject's readily observable location and appearance" was insufficient to justify the detention because this information did not show the tipster was knowledgeable "about the concealed criminal activity." (*Id.* at p. 272.)

In *Alabama v. White* (1990) 496 U.S. 325, 329-332 [110 S.Ct. 2412, 110 L.Ed.2d 301] (*White*), in contrast, decided 10 years before *J.L.*, the Supreme Court held an anonymous tip had sufficient indicia of reliability and was sufficiently corroborated to authorize an investigatory stop. In *White* an anonymous telephone tip the defendant would leave a certain address at a specific time in a certain vehicle and would go to a specific location with a brown attaché case containing cocaine was corroborated by police observations of the defendant leaving the first location in the described vehicle and driving to the second location. The corroboration of the informant's predictions of the defendant's future behavior, the Court explained, demonstrated the informant had special familiarity with the defendant's affairs. That knowledge was sufficient to support an investigatory stop. (*Id*. at pp. 328-332.) In distinguishing *White*, the *J.L.* Court cautioned, "Standing alone, the tip would not have justified a [detention]. [Citation.]

6

Only after police observation showed that the informant had accurately predicted the woman's movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine. . . . Although the court held that the suspicion in *White* became reasonable after police surveillance, we regarded the case as borderline. Knowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband." (*J.L., supra*, 529 U.S. at pp. 270-271.)

Most recently in *Navarette v. California* (2014) __ U.S. __ [134 S.Ct. 1683, 1688, 188 L.Ed.680] (*Navarette*), there was an anonymous 911 tip that a driver of a specific pickup truck with a specific license plate number had run the anonymous caller off the highway at a specific location. Police responded within 18 minutes of the anonymous tip, spotted the truck near the location described by the caller and followed it for about five minutes before pulling it over. As the responding officers approached the truck, they smelled marijuana. The truck was searched and thirty pounds of marijuana were seized from the truck bed.

The Supreme Court found the anonymous tip was sufficiently reliable to credit the allegation the driver of the truck had attempted to run the caller off the highway and therefore justified an investigative stop. (*Navarette, supra*, 134 S.Ct. at pp. 1688-1689.) The Court found because the caller (1) "necessarily claimed eyewitness knowledge" of the dangerous driving, (2) must have known the truck was near the location where it was stopped, and (3) used the 911 system to report the incident and, in doing so, was presumably aware 911 calls are recorded and traceable, all made the tip more reliable than the "bare bones" tip of *J.L.* (*Id.* at pp. 1689-1690.)

Acknowledging even a reliable tip will not justify an investigative stop unless there is some objective and particularized indicia of possible criminal activity, the *Navarette* Court then assessed whether the anonymous tip "created a reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of

7

past recklessness." (*Navarette*, *supra,* 134 S.Ct. at p. 1690.)  The Court reasoned the specific and dangerous conduct reported by the anonymous caller bore "too great a resemblance to paradigmatic manifestations of drunk driving  to be dismissed as an isolated example of reckless." (*Id.* at p. 1691.)  For that reason, the Court concluded the officers were not obligated to follow the pickup truck at length in order to personally observe suspicious driving. (*Id.* at p. 1692.)  The ensuing investigative stop was lawful. (*Ibid.*)[4]  Notwithstanding the dangerous nature of the alleged conduct, the court acknowledged that the case, like *White*, was close.  (*Id.* at p. 1692.)

(iii)  *California Supreme Court decisions on anonymous tips*

The issue of investigatory detentions based on anonymous tips has also been addressed in two California Supreme Court cases.  In *People v. Wells*, *supra*, 38 Cal.4th 1078, police received an anonymous tip of a "possibly intoxicated driver 'weaving all over the roadway.'"  Two or three minutes later an officer located and immediately stopped the vehicle.  The officer did not personally observe the vehicle weaving or otherwise violating any traffic laws.  (*Id.* at p. 1081.)  Pointing to the "exigent circumstances" created by drunk drivers on our roadways, the Supreme Court held the anonymous tip was itself sufficient to raise a reasonable suspicion justifying the traffic stop.  (*Id.* at pp. 1083-1084.)

The *Wells C*ourt distinguished *J.L.* in four respects.  First, the report of a possibly intoxicated driver swerving on the road "poses a far more grave and immediate risk to the public than a report of mere passive gun possession."  (*Wells, supra*, 38 Cal.4th at p. 1087.)  Second, "doubts regarding the tipster's reliability and sincerity are significantly reduced in the setting of a phoned-in report regarding a contemporaneous event of reckless driving presumably viewed by the caller."  Third, a brief vehicle stop is less intrusive than "the 'embarrassing police search' on a public street" involved in *J.L.*

---

**4**    The *Navarette* court was explicit that it was not addressing the circumstance we confront here, where the alleged criminal activity was complete. *(Navarette, supra,* 134 S.Ct. at p. 1690, fn. 2.)

(*Ibid*.)  And finally, the informant gave a "relatively precise and accurate description . . . regarding the vehicle type, color, location, and direction of travel, all confirmed by the investigating officer within minutes of receiving the report."  (*Id*. at p. 1088.)

In *People v. Dolly* (2007) 40 Cal.4th 458 (*Dolly*), decided the year after *Wells,* police had received an anonymous tip that a light-skinned Black male had "'just pulled a gun'" on the caller and had mentioned a gang name.  The caller said the man had a bandage over his left hand as if the hand had been broken and was sitting in the driver's seat of a gray Nissan Maxima parked at a specific location near a recycling center.  Two minutes later, the informant called again and said he had just driven by the Nissan and determined it was black, not gray.  (*Id.* at p. 462.)  At about the time of the second call, officers received a radio dispatch about a light-skinned, Black male with a cast on his arm in a gray Nissan Maxima in the location indicated by the informant who had threatened a 911 caller with a gun.  The officers arrived on the scene and saw a black Maxima with three people inside.  The defendant, who was sitting in the driver's seat, matched the physical description that had been given and had a cast on his arm.  The officers ordered the defendant out of the car and conducted a search.  A loaded, .38-caliber revolver was discovered under the front passenger seat of the car.  (*Ibid.*)

The *Dolly* Court concluded, under the totality of the circumstances, the detention did not violate the defendant's Fourth Amendment rights.  Among those circumstances was the "'grave and immediate risk'" posed to the caller and anyone nearby by the act of pointing a revolver at the caller.  (*Dolly, supra,* 40 Cal.4th at p. 465.)  According to the Court:  "'[A]llegations of the threatening use of a weapon, made by [a] person claiming to be an eyewitness to the threats, required immediate police action' and 'is materially distinguishable from the anonymous tip at issue in . . . *J. L.*,' which involved only an allegation of a concealed weapon."  (*Ibid.*)

The *Dolly* Court was also persuaded by the fact the anonymous tip involved a contemporaneous threat rather than past activity.  (*Dolly, supra*, 40 Cal.4th at p. 467.)  According to the Court, "The police 'may ascribe greater reliability to a tip, even an

9

anonymous one, where an informant "was reporting what he had observed moments ago," not stale or second-hand information.'" (*Id*. at p. 468, quoting from *United States v. Terry-Crespo* (9th Cir. 2004) 356 F.3d 1170, 1177.) The tipster also provided an accurate and detailed description of the perpetrator and his location, which was confirmed minutes later by the police. (*Dolly*, at p. 468.)

       b. *The Officers' detention of Latchman was not objectively reasonable*

The circumstances leading to Latchman's detention fall short of those in *White*, *supra,* 496 U.S. 325, *Navarette, supra,* 134 S.Ct. 1683 and the California Supreme Court cases in which the anonymous tip was found to justify an investigatory detention. To be sure, unlike the "bare-bones tip" in *J.L., supra,* 529 U.S. 266, the anonymous tip in this case contained some internal indicia of reliability: it was a particularized description of a contemporaneous criminal event witnessed by a caller using the 911 system, and the reliability of his or her information could be corroborated by police observation. The problem here is the officers were unable to corroborate the information. By the time they arrived at the intersection, no person was present. Officer Sinkovits testified he saw no one at the intersection. When asked if he saw "any tagging there," Sinkovits answered he was more focused on locating the suspects. The record does not indicate that the officers claimed to have discovered any spray paint cans or other evidence of vandalism at the intersection. That two suspects matching the description of the vandalism suspects were found, sometime after the call, standing outside a nightclub three blocks away did not in any way corroborate that the vandalism had, in fact, occurred. Moreover, nothing in the tip suggested that the men in question were headed in the direction of the nightclub, or were leaving the location at all.

When Latchman was encountered by the officers, there was nothing in his behavior that gave rise to a reasonable suspicion he had committed vandalism or was otherwise involved in criminal activity. Officer Sinkovits did not testify to having seen any paint cans near Latchman or in his possession or any paint on Latchman's clothing or body when he approached Latchman. Thus, unlike the situation confronted by the police

10

in *Wells, supra,* 38 Cal.4th 1078 and *Dolly, supra,* 40 Cal.4th 458, and *Navarette, supra*, 134 S.Ct. 1683, Latchman's reported conduct of standing outside a nightclub was not inherently suspicious. (See *J.L., supra*, 529 U.S. at p. 268.) The one fact that could have contributed to reasonable suspicion—flight upon seeing the police—was undertaken by Latchman's companion, not Latchman.

Finally, unlike in *Wells, supra*, 38 Cal.4th at p. 1087, and *Dolly, supra*, 40 Cal.4th at p. 465, the criminal offense reported by the anonymous caller here did not pose a "grave and immediate risk to the public" such that an anonymous tip was itself sufficient to raise reasonable suspicion. In *Wells* the Court explained "'a drunk driver is not at all unlike a "bomb," and a mobile one at that.'" (*Wells,* at p. 1086, see *Navarette, supra*, 134 S.Ct. at pp. 1691-1692 [referring to dangerous drunk driving behavior].) In *Dolly* the Court emphasized "pointing a revolver at the caller in an apparent threat to shoot him posed a grave and immediate risk not only to the caller but also to anyone nearby." (*Dolly,* at p. 465.) While completed vandalism is a significant property crime, the fact that it occurred, even if corroborated, does not present the kind of exigent circumstances necessitating an immediate police response.

In sum, the facts in this case do not justify deviating from requirement of *J.L.*, *supra,* 529 U.S. 266, that the reliability of an anonymous tip be established to justify an investigatory definition. Although Officer Sinkovits corroborated that two men who fit the description given in the anonymous tip were found, although not at the location described, he did not witness any conduct or obtain other information at the scene to corroborate the tip's assertion that the vandalism had occurred and that Latchman had been involved. Moreover, the conduct reported in the tip did not pose the same sort of "grave and immediate risk to the public" warranting Sinkovits's intervention without such corroboration. (See *Wells, supra,* 38 Cal.4th at p. 1087; *Dolly, supra*, 40 Cal.4th at p. 465; *Navarette*, *supra*, 134 S.Ct. at pp. 1691-1692.)

11

## DISPOSITION

The judgment of conviction is reversed. On remand the trial court is directed to vacate its order denying Latchman's motion to suppress evidence and to enter a new order granting the motion. The trial court is further directed to permit Latchman to withdraw his plea of no contest within 30 days after issuance of the remittitur. If Latchman does not move to withdraw his plea within that time, the judgment of conviction shall be reinstated.


ZELON, J.


We concur:


WOODS, Acting P. J.


SEGAL, J. [*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.