Filed 9/26/16  P. v. Orndorff CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>KYLE M. ORNDORFF,<br><br>　　　Defendant and Appellant. | A141994<br><br>(City & County of San Francisco<br>Super. Ct. No. SCN219647) |

Following the denial of his motion to suppress evidence, a jury convicted defendant Kyle M. Orndorff of grand theft.  Orndorff challenges the ruling on the motion to suppress and also contends the court erred when it did not sua sponte instruct the jury that unanimity was required on the acts that constituted grand theft.  We conclude there was no error and affirm.

## BACKGROUND

On December 27, 2011, San Francisco Police Officer Craig Canton responded to a dispatch directing him to Hawthorne Street in the South of Market area in response to a 911 call.  A witness reported a suspicious man on a bicycle who stopped in front of his building, looked through a backpack he was carrying, and walked away leaving the bicycle behind.  When Officer Canton arrived at the scene, the man who had placed the 911 call guided the officer to Orndorff, who was nearby.  Officer Canton saw Orndorff standing over an object that may have been a laptop.  Officer Canton instructed Orndorff to stop.  Orndorff took off running.  Officer Canton chased after him and found him crouched down hiding behind some bushes.  After Orndorff emerged from his hiding

1

place, Officer Canton placed him in handcuffs. Officer Canton then handed him off to Sergeant Michael Young and Officer Julio Bandoni, who had arrived on the scene.

Sergeant Young asked Orndorff for his name and date of birth, and Orndorff identified himself as Joseph Beck with a birthdate of June 9, 1980. Because Orndorff stated he did not have any identification, Sergeant Young used his patrol car computer system to conduct a search for Joseph Beck and observed that Orndorff did not match the file photo of Joseph Beck. Officer Bandoni searched the backpack and found a laptop, as well as personal documents including mail, a social security card, and driver's license in the name of Joseph Beck. They arrested Orndorff.

The police contacted Beck about the recovered items, and Beck was able to describe the makes, models, and markings of the laptop and the bicycle that was found nearby. That evening, Beck returned to his apartment to find it had been broken into. The bathroom window was broken, and the place was in disarray. Beck's bicycle and laptop were missing, as were certain personal documents.

Orndorff was charged with one count of first degree burglary for unlawfully entering Beck's apartment with the intent to commit larceny and one count of grand theft for stealing Beck's bicycle, laptop, and other personal property.

Prior to trial, Orndorff moved to suppress the evidence derived from his encounter with police, including all of his statements and all observations of the officers and other witnesses, on the ground he was unlawfully detained. He argued the police lacked reasonable suspicion that he had committed or was about to commit a crime. Following briefing and two hearings, the trial court denied the suppression motion.

At trial, the prosecutor presented DNA evidence from an open, partially empty Coca-Cola can found in Beck's apartment that had matched Orndorff's DNA. The prosecutor told the jury in closing argument, "This is a very straightforward case. There was a break-in. There was a burglary. The defendant's DNA places him inside of the apartment. The defendant is then found with the missing property. He then flees at the sight of police . . . . Very direct. Very clear." The prosecutor repeated this conduct as the basis for the people's case and for conviction.

Orndorff testified at trial. Around December 20, 2011, he began sleeping at a park near Beck's apartment building. He partially drank a Coca-Cola that had been left in a cardboard box in the vicinity and returned the unfinished soda can to the box. A belligerent man yelled at him and accused him of stealing his property. The next day when he returned to the park to sleep, he found a bicycle, a backpack, and boxes. For a couple of days, the items remained in the same place undisturbed. Orndorff thought the items had been abandoned. He took the bicycle and the backpack from the park. He ditched the bicycle when he discovered it had no brakes and was hard to ride. After leaving the bicycle, Orndorff looked inside the backpack and found a laptop. He attempted to turn the computer on but without success. In addition to the laptop, he also found documents with Joseph Beck's name on them. At that point, Orndorff thought the backpack might be stolen. Orndorff put the laptop down and began to walk away, and then he encountered the police. Orndorff testified that he walked away from Officer Canton but never ran. When he was asked for identification, he never provided the police with the name Joseph Beck, and he was never in Beck's apartment.

The jury acquitted Orndorff of first degree burglary but convicted him of grand theft.

## DISCUSSION

### A. Motion to Suppress

Prior to trial, Orndorff filed a motion arguing the evidence that had been collected from his encounter with the police should be suppressed because it was the product of an illegal detention. The trial court conducted a hearing on the motion where the following evidence was adduced: Officer Canton testified that on December 27, 2011, he was on-duty and heard from dispatch about "a suspicious person looking through a backpack" who "removed a laptop from the backpack and was looking at it." Dispatch directed Officer Canton to Hawthorne Street and he was provided with a description of the suspect (white male, approximately in his 20s, blue hat, black jacket, black pants). He was also told the reporting party was following the suspect until the police arrived.

When Officer Canton arrived at Hawthorne Street, a man approached him and identified himself as the caller who reported the suspicious activity. The man pointed to a nearby alley off of Hawthorne. Officer Canton walked in that direction towards an alcove. He saw Orndorff, who matched the description given by dispatch. Orndorff was standing next to a laptop which was on the ground. There was no one else around. Officer Canton told Orndorff to stop, at which point Orndorff ran away into the alcove. After a brief pursuit, Officer Canton found Orndorff crouching down, hiding behind utility boxes. When Orndorff complied with Officer Canton's request to stand up, he was handcuffed. Asked why he placed him in handcuffs, Officer Canton stated that Orndorff was described to him and identified by the reporting party who remained with him and because Orndorff fled.

The trial court considering this evidence denied the motion to suppress, ruling Officer Canton had reasonable suspicion to detain Orndorff and the evidence that had been seized would have inevitably been discovered.

Orndorff now contends that the trial court erred when it denied his suppression motion because his detention was not justified under the circumstances and unlawful under the Fourth Amendment. We disagree.

### Standard of Review

When the denial of a motion to suppress evidence is challenged on appeal, we review the record in the light most favorable to the ruling, uphold the trial court's express and implied factual findings if supported by substantial evidence, and independently apply the appropriate federal constitutional standards to those facts. (*People v. Valenzuela* (1999) 74 Cal.App.4th 1202, 1206–1207.) The power to judge credibility, weigh evidence, and draw factual inferences is vested in the trial court and all presumptions favor its findings. (*People v. Leyba* (1981) 29 Cal.3d 591, 596–597.) We review the court's legal conclusions de novo and apply our independent judgment to measure the facts determined by the trial court against the constitutional standard of reasonableness. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

4

*Analysis*

The parties agree Orndorff was not detained until Officer Canton placed him in handcuffs. The question here is whether that detention was reasonable under the Fourth Amendment.

A detention is constitutionally reasonable if the circumstances known or apparent to the detaining officer include "specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity . . . . [T]he facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question." (*People v. Daugherty* (1996) 50 Cal.App.4th 275, 285.)

"The guiding principle in determining the propriety of an investigatory detention is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' [Citations.] In making our determinations, we examine 'the totality of the circumstances' in each case. . . . [¶] The officer's subjective suspicion must be objectively reasonable, and 'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]' [Citation.] But where a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper course of the officer's duties." [Citation.]' " (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

Here, when Officer Canton handcuffed Orndorff, he had a reasonable suspicion to detain him based on several articulable facts: (1) a citizen witness had contacted the police with a report of suspicious activity; (2) the reporting witness remained present at the scene and identified Orndorff to Officer Canton; (3) Officer Canton observed Orndorff alone in a city alley with a laptop computer on the ground next to him; (4) Orndorff said nothing to Officer Canton, and ran away when he asked him to stop; and (5) Officer Canton found Orndorff trying to hide from him. Under the totality of the

5

circumstances, Officer Canton had a reasonable suspicion that Orndorff was involved in crime that had occurred or was about to occur.  (See *Illinois v. Wardlow* (2000) 528 U.S. 119, 125 (*Wardlow*).)

Orndorff contends his detention was unreasonable because none of the information Officer Canton had would have led a reasonable officer to believe criminal activity was afoot.  Orndorff argues that when Officer Canton arrived on the scene, he had only a physical description of Orndorff and information that he was looking at a laptop.  Officer Canton's only observation was Orndorff standing by a laptop.  There is no evidence that he was in a high-crime area.  According to Orndorff,  these circumstances did not justify his detention and his flight cannot provide the basis for reasonable suspicion.

Orndorff is correct that his description and engaging in conduct that is not criminal on its face would not create reasonable suspicion.  (See *In re Tony C.* (1978) 21 Cal.3d 888, 898 (*Tony C.*), *Florida v. J.L.* (2000) 529 U.S. 266, 272 (*J.L.*).)  Nonetheless, this information is relevant in combination and can be considered in a Fourth Amendment analysis.

Although looking at a laptop is not a criminal act, "the possibility of any innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct." (*Tony C.*, *supra*, 21 Cal.3d at p. 894.)  The purpose of an officer's investigation is to resolve that ambiguity and establish whether there is illegal activity underway.  (*Ibid.*)  Moreover, while there is no evidence that Officer Canton detained Orndorff  in a high-crime area, Officer Canton was "not required to ignore the relevant characteristics of a location in determining whether the circumstances [were] sufficiently suspicious to warrant further investigation." (*Wardlow*, *supra*, 528 U.S. at p. 124.)  Thus, Orndorff standing alone next to a laptop on the ground in a city alley should not be excluded in weighing Officer Canton's assessment.

Orndorff also disregards or dismisses other factors we consider when analyzing the totality of the circumstances.  Officer Canton sought to investigate Orndorff pursuant to a citizen's report.  In general, "private citizens who are witnesses to . . . a criminal act, absent some circumstances that would cast doubt upon their information, should be

considered reliable . . . . [N]either a previous demonstration of reliability nor subsequent corroboration is ordinarily necessary when witnesses to or victims of criminal activities report their observations in detail to the authorities." (*People v. Ramey* (1976) 16 Cal.3d 263, 269 (*Ramey*).)  Officer Canton was aware of a citizen's report of a suspicious person looking through a backpack and received direct confirmation from the reporting citizen at the scene that Orndorff was the subject of his call.  The citizen also remained present on the scene throughout Officer Canton's investigation. [1]

In addition, Officer Canton received no response from Orndorff when the officer asked him to stop; instead, Orndorff ran away.  To be sure, individuals may ignore police inquiries and go on their way, and their refusal to stop will not provide the police justification to stop them.  (See *Florida v. Royer* (1983) 460 U.S. 491, 497–498.)  But Orndorff's assertion he simply chose to ignore Office Canton when told to stop disregards his attempt to flee.  Orndorff was free to exercise his right to ignore Officer Canton and "go on his way" but that does not shield him from the consequences of running from law enforcement.

We disagree with Orndorff that we may not consider his flight from Officer Canton in determining whether his detention was justified.  "The timing of the seizure is significant—if the seizure occurred after suspicious behavior such as flight, this factors into our analysis of whether there was reasonable suspicion to justify the seizure.  But if the seizure occurred before the flight . . . then the flight 'plays no role in the reasonable suspicion analysis.'  [Citation.]" (*U.S. v. Smith* (3d. Cir. 2009) 575 F.3d 308, 312.)

---

[1] While the report from the citizen witness and his continued presence at the scene factor minimally into our analysis, these are not decisive.  We recognize that the information conveyed by the citizen's report—that someone was looking at a laptop and through a backpack—conveyed no criminal activity to the police and alone could not have fostered a reasonable suspicion that Orndorff violated the law.  (See *J.L.*, *supra*, 529 U.S. at p. 272.)  Moreover, while citizen witnesses tend to be reliable, there is no evidence that the police ever identified the citizen informant who reported Orndorff to police or confirmed his status as a true citizen informant.  (See *Ramey*, *supra*, 16 Cal.3d at p. 269.)  For these reasons, we do not see these particular factors as fundamental to our conclusion.

Orndorff does not dispute that he was seized right after he fled. Accordingly, Orndorff's flight properly factors into our analysis.

Orndorff's attempt to flee from Officer Canton plays a pivotal role in our analysis, and the implications of such flight are well addressed by numerous authorities. "[F]light from police is a proper consideration—and indeed can be a key factor—in determining whether in a particular case the police have sufficient cause to detain." (*People v. Souza* (1994) 9 Cal.4th 224, 235.) In *Wardlow*, *supra*, 528 U.S. 119, the Supreme Court found that the defendant's presence in an area of heavy narcotics trafficking and his unprovoked flight upon noticing the police created a reasonable suspicion justifying his detention. (*Id.* at pp. 124–125.) The court contrasted the defendant's flight with the situation where one "go[es] about his business" and rightfully ignores an officer who approaches him without any reasonable suspicion. (*Ibid.*) The Court observed, "[U]nprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." (*Id.* at p. 125.)

Orndorff's efforts to distinguish *Wardlow* are not persuasive. The fact Orndorff's detention did not take place in a high-crime area is not conclusive in a "totality of the circumstances—whole picture" analysis. (See *U.S. v. Cortez* (1981) 449 U.S. 411, 417–418.) Orndorff's portrayal of his flight as "not unprovoked" and therefore distinct from *Wardlow* is also unpersuasive. "Headlong flight—wherever it occurs—is the consummate act of evasion; it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." (*Wardlow, supra,* 528 U.S. at p. 125.) As such, Orndorff's attempt to run away is a factor justifying his detention.

The cases Orndorff relies upon to excuse or downplay the significance of his flight do not compel a different result. In *People v. Raybourn* (1990) 218 Cal.App.3d 308, the court found that the detention took place when the officer *began to chase the defendant* and thus did not consider the flight in determining whether the detention was reasonable. (*Id.* at p. 313.) *California v. Hodari D.* (1991) 499 U.S. 621 made clear that police pursuit in attempting to seize a person does not amount to a detention within the meaning of the Fourth Amendment. (*Id.* at p. 626.) Because Orndorff was not detained until he

was handcuffed by Officer Canton, his flight is rightly considered. In *In re Michael V.* (1974) 10 Cal.3d 676, the court observed that the defendant's "flight provided ample cause for his arrest and the resulting search." (*Id.* at p. 681.)

As a final factor in our totality of the circumstances analysis, we note that Officer Canton found Orndorff trying to hide after he fled. In *People v. Allen* (1980) 109 Cal.App.3d 981, the court made the "obvious conclusion" that officers had adequate grounds to detain the defendant after he ran from them into a residential area and they found him hiding underneath a table in some bushes beside a residence. (*Id.* at pp. 984–985.) Orndorff's post-flight concealment reasonably added support to Officer Canton's suspicion that criminal activity was afoot and Orndorff was involved.

Officer Canton had a reasonable suspicion that Orndorff was engaged in criminal activity and therefore was permitted to detain him. In light of this conclusion that Officer Canton was reasonably justified in detaining Orndorff, we do not address the issues Orndorff raises under the inevitable discovery doctrine.

### B.      Unanimity Instruction

Orndorff also contends that because the jury was provided evidence of alternative circumstances that led to his possession of Beck's property, the trial court erred when it failed to instruct the jury sua sponte that it had to come to a unanimous agreement on the acts that constituted theft. We again disagree.

*Analysis*

A criminal defendant has a constitutional right to a unanimous jury verdict. (Cal. Const., art. I, § 16.) "Additionally, the jury must agree unanimously the defendant is guilty of a specific crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, *either* the prosecution must elect among the crimes *or* the court must require the jury to agree on the same criminal act. [Citations.]." (*People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1452) (italics added). No unanimity instruction is required when the prosecution makes an election as to which act constitutes which count. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) "The duty to instruct on unanimity when no election has been made rests upon the court sua

9

sponte.  [Citation.]"  (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)  Even when the defendant does not request a unanimity instruction, "such an instruction must be given sua sponte where the evidence adduced at trial shows more than one act was committed which could constitute the charged offense, and the prosecutor has not relied on any single such act." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 274–275.)

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]  . . . . 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done something sufficient to convict on one count.' [Citation.]" (*Russo*, *supra*, 25 Cal.4th at p. 1132. )  A unanimity instruction is not required when the evidence shows only one criminal act. (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1198.)  We review a claim of instructional error de novo.  (*People v. Shaw* (2002) 97 Cal.App.4th  833, 838.)

In this case, no unanimity instruction was necessary because there was no evidence of two distinct criminal acts on which the jurors could have convicted Orndorff of theft.  Orndorff argues that his trial testimony that he took Beck's property from a park after someone else abandoned it is "an alternative factual predicate supporting criminal liability" and "alternative theory of the crime" in order to justify the unanimity instruction.  His assertion completely distorts the record, which makes clear that this alternative scenario was not a path to conviction but more accurately a path to potential acquittal.  Orndorff acknowledges that in his version of events, he acquired Beck's property in such "circumstances that [Defendant] believed to be lawful" and that "the end result" of his alternative fact scenario would have been that "he faced no criminal liability for his conduct."  Since the alternative fact scenario in the record supported a claim of innocence not guilt, the jurors never had to assess multiple criminal acts which could have supported conviction.  Without multiple criminal acts, a unanimity instruction was not necessary.

10

Even if we were to accept Orndorff's argument that the jury was faced with two criminal acts which could have supported conviction, we conclude no unanimity instruction was required because the prosecutor clearly elected the acts supporting the theft charge. This was not a case where the prosecutor asked the jurors to select from among several discrete acts by defendant in order to convict. Any fair reading of the prosecutor's arguments demonstrates this case was presented to the jury on the single theory that Orndorff committed theft by taking Beck's personal property after breaking into his apartment. In her closing argument, the prosecutor told the jury, "This is a very straightforward case. There was a break-in. There was a burglary. The defendant's DNA places him inside the apartment. The defendant is then found with the missing property. He then flees at the sight of police . . . . Very direct. Very clear." The prosecutor repeated the basis for the people's case and for conviction: "So once you figure out what the facts are, you then apply the law to the facts. He entered the building to commit the burglary. He took the stuff, which was worth over $950, and you convict him." She echoed the single theory again: "He broke in. He took the items, and he left." In doing so, the prosecution elected the specific act relied on to prove the theft.

While Orndorff recognizes the prosecution made the necessary election about the acts that constituted theft, he nonetheless argues the need for a unanimity instruction because the prosecution never objected to the alternative version of events Orndorff presented to the jury to explain his innocence. However, we are aware of no authority that supports Orndorff's position that requires the prosecution to object to a defendant's alternative scenario or requires a unanimity instruction when a clear and unambiguous election is made.[2] Orndorff admits his argument "is venturing into unexplored legal

---

[2] Orndorff's claim that that prosecution never objected to his version of events is simply inaccurate. The prosecutor spent considerable time in her closing argument explaining to the jury how Orndorff's version of events "makes absolutely no sense." The record is clear the prosecution rejected Orndorff's story and conveyed that to the jury. Had the prosecutor not done so, we would still reach the same conclusion that no unanimity instruction was required in light of the prosecutor's clear and unambiguous election of the criminal act that supported conviction.

territory" and there is no published decision to support it. The cases he relies on, *Standley v. Feather River Pine Mills* (1952) 112 Cal.App.2d 101, 104 and *Gray v. Janss Inv. Co.* (1921) 186 Cal. 634, are both civil cases. He appears to cite them for the obvious proposition that juries may consider relevant evidence. But this unremarkable point cannot be stretched to require a unanimity instruction in these circumstances. Orndorff lacks any compelling authority to support his argument, and it is not our role to supply it. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

A unanimity instruction was not required in this case and the court had no sua sponte duty to give one. In light of this conclusion, we need not consider whether Orndorff was prejudiced by the lack of any such instruction.

## DISPOSITION

The judgment is affirmed.


_____
Siggins, J.


We concur:


_____
McGuiness, P.J.


_____
Pollak, J.

12